1  STUART C. CLARK (SBN 124152)
   clark@carrferrell.com
2  CHRISTINE S. WATSON (SBN 218006)
   cwatson@carrferrell.com
3  CARR & FERRELL *LLP*
   2200 Geng Road
4  Palo Alto, California 94303
   Telephone: (650) 812-3400
5  Facsimile:  (650) 812-3444

6  Attorneys for Plaintiff
   PATRICK PIERCE

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                SAN JOSE DIVISION

11

12 PATRICK PIERCE,                    CASE NO. C08-01554 JF (HRL)

13          Plaintiff,               **SUPPLEMENTAL DECLARATION**
                                     **OF PATRICK PIERCE IN SUPPORT**
14     v.                            **OF MOTION OF PATRICK PIERCE**
                                     **FOR REMAND TO THE SUPERIOR**
15 WELLS FARGO BANK,                 **COURT FOR THE COUNTY OF**
   and DOES 1 through 20,            **SANTA CLARA**
16
                                     Date:    June 27, 2008
17          Defendants.              Time:    9.00 a.m.
                                     Place:   Courtroom 3, 5th Floor
18                                   Judge:   Hon. Jeremy Fogel

19

20

21         I, PATRICK PIERCE, declare as follows:

22         1.      I am the plaintiff in this action.  The facts set forth herein are within my personal

23 knowledge, and if called upon to do so I could and would testify to the truth thereof.

24         2.      I previously submitted a declaration in support of my motion to remand this action to

25 state court.  I make this declaration to supplement my earlier declaration.

26         3.      When I filed this action I was aware of two versions of a change in control plan that

27 related to employees of Greater Bay Bancorp ("GBB").  I understood then, as I do now, that one of

28

{00317428v1}                         -1-
        Supplemental Declaration of Patrick Pierce in Support of Motion of Patrick Pierce for
     Remand to the Superior Court for the County of Santa Clara (Case No. C08-01554 JF (HRL))

1  those versions was effective prior to June 19, 2007, and that the other was effective from that date.

2  Copies of the referenced plans are attached as Exhibits "A" and "B".

3      4.      I understand that Wells Fargo Bank has sought to introduce into evidence a further

4  change in control plan that allegedly came into effect as of September 28, 2007. I attach, as Exhibit

5  "C", a copy of the document that I understand that WFB sought to introduce as a copy of that plan.

6      5.      Attached as Exhibit "D" is a true but redacted copy of the letter that I received from

7  WFB, on behalf of the Plan Administrator. A copy of Exhibit "C" was attached to that letter when I

8  received it.

9      I declare under penalty of perjury under the laws of the State of California that the foregoing

10  is true and correct.

11      Executed at Palo Alto, California, this 13 day of June, 2008.

12

13                                          _____

14                                                PATRICK PIERCE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

{00317428v1}

-2-

## Exhibit Index

| Exhibit No. | Description |
| --- | --- |
| EX-10.1 | Severance Plan I (amended and restated effective January 1, 2005) |
| EX-10.2 | Severance Plan II (amended and restated effective January 1, 2005) |
| EX-10.3 | Change in Control Pay Plan I (amended and restated effective January 1, 2005) |
| EX-10.4 | Change in Control Pay Plan II (amended and restated effective January 1, 2005) |

**Exhibit 10.4**

## GREATER BAY BANCORP
## CHANGE IN CONTROL PAY PLAN II

### Amended and Restated Effective January 1, 2005

### ARTICLE I

### PURPOSE

GREATER BAY BANCORP (the "Company") established, effective as of January 1,1998, as amended and restated effective as of August 21, 2001, a change in control pay plan to provide severance benefits to selected executives who are deemed Eligible Employees and whose employment terminates in connection with a Change in Control. The Company hereby amends and restates such plan, effective as of January 1, 2005, in accordance with the terms set forth hereunder. The intent of the plan is to ensure all Eligible Employees (as the term is defined herein) have reasonable protection related to any event as specified in this plan.

### ARTICLE II

### EFFECTIVE DATE

All of the policies and practices of each Member Company regarding severance, or similar payments to Eligible Employees upon their employment termination on account of a Change in Control are hereby superseded by this plan which shall be known as the GREATER BAY BANCORP Change in Control Pay Plan II (the "Plan"), effective January 1, 2005.

### ARTICLE III

### DEFINITIONS

Section 3.1 Affiliated Company means:

(a) Any corporation (other than the Company) that is included in a controlled group of corporations, within the meaning of Code Section 414(b), that includes the Company, and

(b) Any trade or business (other than the Company) that is under common control with the Company within the meaning of Code Section 414(c), and

(c) Any member (other than the Company) of an affiliated service



group, within the meaning of Code Section 414(m), that includes the Company, and

(d) Any other entity required to be aggregated with the Company pursuant to regulations under Code Section 414(o).

Section 3.2 Base Benefit means the severance benefit payable to a Participant in accordance with Articles IV and V of the Plan, the amount of which is based upon such Participant's Pay and his title or position as of the date he terminates employment with a Member Company on account of a Change in Control.

Section 3.3 Board of Directors means the board of directors of the Company.

Section 3.4 Change in Control means the first to occur of any of the following events:

(A) Any "person" (as that term is used in Section 13 and 14(d)(2) of the Securities Exchange Act of 1934 ("Exchange Act")) becomes the beneficial owner (as that term is used in Section 13(d) of the Exchange Act), directly or indirectly, of 25% or more of the Company's capital stock entitled to vote in the election of directors;

(B) During any period of not more than two consecutive years, not including any period prior to the adopting of this Plan, individuals who, at the beginning of such period constitute the Board of Directors of the Company, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in clause (A), (C), (D) and (E) of this Article) whose appointment to the Board of Directors or nomination for election to the Board of Directors was approved by a vote of at least three-fourths (3/4ths) of the directors then still in office, either were directors at the beginning of the period or whose appointment or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof;

(C) The shareholders of the Company approve any consolidation or merger of the Company, other than a consolidation or merger of the Company on which the holders of the common stock of the Company immediately prior to the consolidation or merger hold more than 50% of the common stock of the surviving corporation immediately after the consolidation or merger;

(D) The shareholders of the Company approve any plan or proposal for the liquidation or dissolution of the Company; or

(E) The shareholders of the Company approve the sale or transfer of substantially all of the Company's assets to parties that are not within a "controlled group of corporations" (as defined in Code Section 1563) in which the Company is a member.

Section 3.5 Code means the Internal Revenue Code of 1986, as amended.

Section 3.6 Committee means the Benefits Administration Committee appointed by the Compensation Committee of the Company's Board of Directors.

Section 3.7 Company means GREATER BAY BANCORP.

Section 3.8 Effective Date means January 1, 2005.

Section 3.9 Employee means (1) any full-time employee of a Member Company or (2) any regular part-time employee of a Member Company. For purposes of this Section 3.9, "full-time employee" shall mean an employee of a Member Company who is regularly scheduled to work at least forty (40) hours per week for twelve (12) months each year. Notwithstanding the foregoing, with respect to employees of a Member Company which requires fewer than forty (40) hours per week for classification as a full-time employee, "full-time employee" shall be defined according to such Member Company's administrative policy and practice. "Regular part-time" employee shall mean any employee of a Member Company who is regularly scheduled to work at least twenty (20) hours per week for twelve (12) months each year, but fewer hours than necessary to classify him as a full-time employee.

Section 3.10 Eligible Employee means an Employee who is a key executive of a Member Company and who is eligible to participate in the Plan. The only Employees who are deemed "Eligible Employees" for purposes of the Plan are the members of the Company's Managing Committee who are employees of a Member Company.

Section 3.11 ERISA means the Employee Retirement Income Security Act of 1974, as amended.

Section 3.12 Leave of Absence means a period of absence from regular employment which is approved by the Member Company in a non-discriminatory manner for reasons such as, but not limited to, sickness, disability, education, jury duty, convenience to the Company, maternity or paternity leave, family leave, or for periods of military duty during which the Employee's reemployment rights are protected by law.

Section 3.13 Member Company means the Company or an Affiliated Company, provided that the Compensation Committee of the Company's Board of Directors consents to the participation of any such Affiliated Company in the Plan with respect to Eligible Employees of such Affiliated Company.

Section 3.14 Participant means an Employee who satisfies the requirements under Section 4.1 of the Plan.

Section 3.15 Pay means an Eligible Employee's current annual rate of regular base salary or wages on the date of termination of employment with a Member Company and the average of the annual and/or incentive bonuses paid to an Eligible Employee over the three years immediately preceding the date of his termination of employment on account of a Change in Control, excluding all other extra pay such as overtime, commissions, premiums, supplements, imputed income and living, auto or other allowances.

Section 3.16 Plan means the Greater Bay Bancorp Change in Control Pay Plan II.

Section 3.17 Plan Year means each twelve (12) consecutive month period from January 1 through December 31.

ARTICLE IV

ELIGIBILITY FOR BENEFITS

Section 4.1 Employees Eligible for Severance Benefits. Except as provided in this Section 4.1 and in Section 4.2 and subject to Section 5.6, an Eligible Employee whose employment is terminated by a Member Company on or after the Effective Date shall be eligible for a Base Benefit if:

(a) Subject to Section 4.2, the Eligible Employee's employment is terminated as a result of a Change in Control within three (3) years of the effective time of the Change in Control (the "effective time" of the Change in Control will have the same meaning provided in Section 7.2); and

(b) The Eligible Employee's employment is not terminated for cause for personal conduct; and

(c) The Eligible Employee executes a waiver and release agreement in such form as determined by the Committee (the "Waiver and Release Agreement") and returns the Waiver and Release Agreement to the Company within the time period specified in the Waiver and Release Agreement.

Section 4.2 Employees Not Eligible For Severance Benefits. An Eligible Employee shall not be entitled to a Base Benefit set forth in Article V if:

(a) The Eligible Employee has in force an employment contract or executive severance agreement with a Member Company which includes provision for the payment of severance benefits upon the termination of his employment upon a Change in Control, unless such severance benefits are less than the Base Benefit provided for in the Plan; or

(b) The Eligible Employee is offered employment by the successor employer in the same position or in another position of comparable pay and status to the position he held immediately prior to the effective date of the Change in Control, or the Eligible Employee is offered employment by a Member Company in another position of comparable pay and status to the position held immediately prior to the Change in Control, regardless of whether he accepts the offer; or

(c) The Eligible Employee's employment is involuntarily terminated for cause for personal conduct (an Eligible Employee whose employment is terminated for cause related to his work performance may be eligible to receive severance benefits under the Plan as the Committee in its sole discretion may determine); or

(d) The Eligible Employee fails to perform his regular assigned job duties through the date specified by a Member Company as his termination date; or

(e) The Eligible Employee fails to return a properly executed Waiver and Release Agreement on a timely basis.

For purposes of this Section 4.2, a "position of comparable pay and status" shall mean a position with not less than one hundred percent (100%) of the Pay, bonus opportunity and benefits of the position held by the Eligible Employee prior to his termination of employment and with a similar scope of duties and responsibilities to such prior position. In addition, a position will not be considered a position of

comparable pay and status if (i) an Eligible Employee is required to increase his normal commuting miles to reach a new worksite, and (ii) the normal commuting from his home to the new worksite exceeds 35 miles each way. Notwithstanding the foregoing, the Committee reserves the right to make decisions based on the facts and circumstances of individual cases as to whether a position is of comparable pay and status to that held by an Eligible Employee prior to his employment termination, provided that the Eligible Employee may appeal any such decision pursuant to the provisions of Section 6.5.

## ARTICLE V

## SEVERANCE BENEFITS

Section 5.1 Calculation of Severance Benefit. Subject to the provisions of Section 4.1 and 4.2, a Participant whose employment is terminated (or constructively terminated by not being offered a "position of comparable pay and status" as defined in Section 4.2) as a result of a Change in Control, shall be entitled to receive a Base Benefit under this Plan equal to thirty (30) months of Pay.

Participants entitled to a Base Benefit shall also receive the following severance benefits: (1) for the length of the severance period, health (or COBRA coverage) and life insurance benefits under the Company's group plans then in effect on terms offered to current employees; (2) outplacement services deemed appropriate by the Committee; and (3) a pro-rated bonus for work performed during the year in which the Change in Control occurs. The pro-rated bonus shall be an amount equal to the average of the annual incentive bonuses for the three-year period immediately preceding the date of termination, pro-rated for the number of months the Participant was employed during the year of termination, subject to the Participant receiving at least a satisfactory performance evaluation.

Section 5.2 Indemnity.

(a) In the event it shall be determined that any payment by the Company to or for the benefit of a Participant pursuant to the terms of this Plan (a "Payment") would subject a Participant to the excise tax imposed by Section 4999 of the Internal Revenue Code of 1986, as amended (the "Code"), or any interest or penalties are incurred by a Participant with respect to such excise tax (such excise tax, together with any such interest and penalties, are hereinafter collectively referred to as the "Excise Tax"), then such Participant shall be entitled to receive an additional payment (a "Gross-Up Payment") in an amount such that after payment by such Participant of all taxes (including any interest or penalties imposed with respect to such taxes), including, without limitation, any income taxes (and any interest and penalties imposed with respect thereto) and Excise Tax imposed upon the Gross-Up Payment, such Participant retains an amount of the Gross-Up Payment equal to the Excise Tax imposed upon the payments.

(b) Subject to the provisions of the next paragraph, all determinations required to be made under this Plan, including whether and when a Gross-Up Payment is required and the amount of such Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by a certified public accounting firm designated by the Committee (the "Accounting Firm") which shall provide detailed supporting calculations both to the Company and the Participant within 15 business days of the receipt of notice from the

Participant that there has been a Payment, or such earlier time as is requested by the Company. All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any Gross-Up Payment, as determined pursuant to this Plan, shall be paid by the Company to the Participant within five days of the later of (i) the due date for the payment of any Excise Tax, and (ii) the receipt of the Accounting Firm's determination. Any determination by the Accounting Firm shall be binding upon the Company and the Participant. As a result of the uncertainty in the application of Section 4999 of the Code at the time of the initial determination by the Accounting Firm hereunder, it is possible that Gross-Up Payments which will not have been made by the Company should have been made ("Underpayment"), consistent with the calculations required to be made hereunder. In the event that the Company exhausts its remedies pursuant to the next paragraph and the Participant thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has occurred and any such Underpayment shall be promptly paid by the Company to or for the benefit of the Participant.

(c) As a condition to indemnification hereunder, each Participant must notify the Company in writing of any claim by the IRS that, if successful, would require the payment by the Company of the Gross-Up Payment and comply with the rules in this paragraph (c) and in paragraph (d). Such notification shall be given as soon as practicable but not later than ten business days after the Participant is informed in writing of such claim and shall apprise the Company of the nature of such claim and the date on which such claim is requested to be paid. The Participant shall not pay such claim prior to the expiration of the 30-day period following the date on which the Participant gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to such claim is due). If the Company notifies the Participant in writing prior to the expiration of such period that it desires to contest such claim, the Participant must: (i) give the Company any information reasonably requested by the Company relating to such claim, (ii) take such action in connection with contesting such claim as the Company shall reasonably request in writing from time to time, including, without limitation, accepting representation with respect to such claim by an attorney or accountant reasonably selected by the Company, (iii) cooperate with the Company in good faith in order effectively to contest such claim, and (iv) permit the Company to participate in any proceedings relating to such claim; *provided, however,* that the Company shall bear and pay directly all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold the Participant harmless, on an after-tax basis, for any Excise Tax or income tax (including interest and penalties with respect thereto) imposed as a result of such representation and payment of costs and expenses. Without limitation on the foregoing provisions of this paragraph, the Company shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forego any and all administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of such claim and may, at its sole option, either direct the Participant to pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and the Participant must prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as the Company shall determine; *provided, however,* that if the Company directs the Participant to pay

such claim and sue for a refund, the Company shall advance the amount of such payment to the Participant, on an interest-free basis, and shall indemnify and hold the Participant harmless, on an after-tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such advance or with respect to any imputed income with respect to such advance; and further provided that any extension of the statute of limitations relating to payment of taxes for the taxable year of the Participant with respect to which such contested amount is claimed to be due is limited solely to such contested amount. Furthermore, the Company's control of the contest shall be limited to issues with respect to which a Gross-Up Payment would be payable hereunder and the Participant shall be entitled to settle or contest, as the case may be, any other issue raised by the IRS or any other taxing authority.

(d) If, after the receipt by the Participant of an amount advanced by the Company pursuant to this letter agreement, the Participant becomes entitled to receive any refund with respect to such claim, the Participant must (subject to the Company's complying with the requirements of the preceding paragraph) promptly pay to the Company the amount of such refund (together with any interest paid or credited thereon after taxes applicable thereto). If, after the receipt by the Participant of an amount advanced by the Company pursuant to the preceding paragraph, a determination is made that the Participant shall not be entitled to any refund with respect to such claim and the Company does not notify the Participant in writing of its intent to contest such denial or refund prior to the expiration of 30 days after such determination, then such advance shall be forgiven and shall not be required to be repaid and the amount of such advance shall offset, to the extent thereof, the amount of Gross-Up Payment required to be paid.

Section 5.3 Payment of Benefits. The Plan shall pay severance benefits to a Participant whose employment is terminated on account of a Change in Control in the form of a lump sum or equal installments payable over a period not to exceed twenty-four (24) months, as the Committee in its sole discretion may determine. The Plan shall make lump sum distributions as soon as administratively practicable and in no event later than thirty (30) days following the receipt by the Company of a timely and properly executed Waiver and Release Agreement. The Plan shall make installment payments in accordance with the Member Company's normal payroll schedule beginning with the first payroll date as soon as administratively practicable following receipt by the Company of a timely and properly executed Waiver and Release Agreement.

Section 5.4 Payment Offset. A Member Company reserves the right to offset the benefits payable under Sections 5.1 by any advance, loan or other monies a Participant owes the Member Company. All applicable federal, state and local taxes shall be withheld from all severance payments.

Section 5.5 Unfunded Plan. The obligations of the Company under this Plan may be funded through contributions to a trust or otherwise, but the obligations of the Company are not required to be funded under this Plan unless required by law. Nothing contained in this Plan shall give a Participant any right, title or interest in any property of the Company.

Section 5.6 Prohibition against Certain Payments. Notwithstanding any provision of the Plan to the contrary, no Participant shall be entitled to receive, and a Member

Company shall not pay, any amount under this Plan that is prohibited by Section 359.1(h) of the Federal Deposit Insurance Corporation Rules and Regulations("FDIC Rules and Regs").

## ARTICLE VI

## ADMINISTRATION

Section 6.1 Plan Administration. The Company shall be the administrator of the Plan for purposes of Section 3(16) of ERISA and shall have responsibility for complying with any ERISA reporting and disclosure rules applicable to the Plan for any Plan Year.

Section 6.2 Plan Committee. In all respects other than as provided in Section 6.1, the Plan shall be administered and operated by the Committee. The Committee shall have all powers necessary to supervise the administration of the Plan and control its operations. In addition to any powers and authority conferred to the Committee elsewhere in the Plan or by law, the Committee shall have, by way of illustration but not by way of limitation, the following discretionary powers and authority:

(a) To allocate fiduciary responsibilities among the named fiduciaries and to designate one or more other persons to carry out fiduciary responsibilities. However, no allocation or delegation under this Section 6.2(a) shall be effective until the person or persons to whom the responsibilities have been allocated or delegated agree to assume the responsibilities;

(b) To designate agents to carry out responsibilities relating to the Plan, other than fiduciary responsibilities;

(c) To employ such legal, accounting, clerical, and other assistance as it may deem appropriate in carrying out the provisions of this Plan, including one or more persons to render advice with regard to any responsibility any fiduciary may have under the Plan;

(d) To establish rules and procedures from time to time for the conduct of the Committee's business and the administration and effectuation of this Plan;

(e) To administer, interpret, construe and apply this Plan. To decide all questions which may arise or which may be raised under this Plan by any Employee, Participant, former Participant or other person whatsoever, including but not limited to all questions relating to eligibility to participate in the Plan, the amount of service of any Participant, and the amount of benefits to which any Participant may be entitled;

(f) To determine the manner in which the severance benefits of this Plan, or any part thereof, shall be administered; and

(g) To perform or cause to be performed such further acts as it may deem to be necessary, appropriate or convenient in the efficient administration of the Plan.

Any action taken in good faith by the Committee in the exercise of discretionary

authority conferred upon it by this Plan shall be conclusive and binding upon the Participants. All discretionary powers conferred upon the Committee shall be absolute. However, all discretionary powers shall be exercised in a uniform and nondiscriminatory manner.

Section 6.3 Named Fiduciary. The members of the Committee shall be named fiduciaries with respect to this Plan for purposes of Section 402 of ERISA.

Section 6.4 Indemnification of Committee. The Company shall, to the extent permitted by law, by the purchase of insurance or otherwise, indemnify and hold harmless each member of the Committee and each other fiduciary with respect to this Plan for liabilities or expenses they and each of them incur in carrying out their respective duties under the Plan, other than for any liabilities or expenses arising out of such fiduciary's gross negligence or willful misconduct. A fiduciary shall not be responsible for any breach of responsibility of any other fiduciary except to the extent provided in Section 405 of ERISA.

Section 6.5 Claims Procedure.

(a) Applications for Benefits and Inquiries. Any application for benefits, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Committee in writing by an applicant (or his authorized representative). The address for the Committee is:

Plan Committee

Greater Bay Bancorp

1900 University Avenue, Suite 600

East Palo Alto, CA 94303

(b) Denial of Claims. In the event that any application for benefits is denied in whole or in part, the Committee must provide the applicant with written or electronic notice of the denial of the application, and of the applicant's right to review the denial. Any electronic notice will comply with the regulations of the U.S. Department of Labor. The notice of denial will be set forth in a manner designed to be understood by the applicant and will include the following:

(i) the specific reason or reasons for the denial;

(ii) references to the specific Plan provisions upon which the denial is based;

(iii) a description of any additional information or material that the Committee needs to complete the review and an explanation of why such information or material is necessary; and

(iv) an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the applicant's right to bring a civil action under section 502(a) of ERISA following a denial on

review of the claim, as described in Section 6.5(d) below.

This notice of denial will be given to the applicant within ninety (90) days after the Committee receives the application, unless special circumstances require an extension of time, in which case, the Committee has up to an additional ninety (90) days for processing the application. If an extension of time for processing is required, written notice of the extension will be furnished to the applicant before the end of the initial ninety (90) day period.

This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Committee is to render its decision on the application.

(c) <u>Request for a Review</u>. Any person (or that person's authorized representative) for whom an application for benefits is denied, in whole or in part, may appeal the denial by submitting a request for a review to the Committee within sixty (60) days after the application is denied. A request for a review shall be in writing and shall be addressed to:

Plan Committee

Greater Bay Bancorp

1900 University Avenue, Suite 600

East Palo Alto, CA 94303

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent. The applicant (or his representative) shall have the opportunity to submit (or the Committee may require the applicant to submit) written comments, documents, records, and other information relating to his claim. The applicant (or his representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his claim. The review shall take into account all comments, documents, records and other information submitted by the applicant (or his representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(d) <u>Decision on Review</u>. The Committee will act on each request for review within sixty (60) days after receipt of the request, unless special circumstances require an extension of time (not to exceed an additional sixty (60) days), for processing the request for a review. If an extension for review is required, written notice of the extension will be furnished to the applicant within the initial sixty (60) day period. This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Committee is to render its decision on the review. The Committee will give prompt, written or electronic notice of its decision to the applicant. Any electronic notice will comply with the regulations of the U.S. Department of Labor. In the event that the Committee confirms the denial of the application for benefits in whole or in part, the notice will set forth, in a manner calculated to be understood by the applicant, the following:

(i) the specific reason or reasons for the denial;

(ii) references to the specific Plan provisions upon which the denial is based;

(iii) a statement that the applicant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his claim (excluding those protected by legal privilege); and

(iv) a statement of the applicant's right to bring a civil action under section 502(a) of ERISA.

(e) <u>Rules and Procedures</u>. The Committee will establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out its responsibilities in reviewing benefit claims. The Committee may require an applicant who wishes to submit additional information in connection with an appeal from the denial of benefits to do so at the applicant's own expense.

(f) <u>Exhaustion of Remedies</u>. No legal action for benefits under the Plan may be brought until the claimant (i) has submitted a written application for benefits in accordance with the procedures described by Section 6.5(a) above, (ii) has been notified by the Committee that the application is denied, (iii) has filed a written request for a review of the application in accordance with the appeal procedure described in Section 6.5(c) above, and (iv) has been notified that the Committee has denied the appeal. Notwithstanding the foregoing, if the Committee does not respond to a Participant's claim or appeal within the relevant time limits specified in this Section 6.5, the Participant may bring legal action for benefits under the Plan pursuant to Section 502(a) of ERISA.

## ARTICLE VII

## AMENDMENT AND TERMINATION

<u>Section 7.1 Before Change in Control</u>. This Plan may be amended from time to time, or terminated at any time at the discretion of the Board of Directors by a written resolution adopted by a majority of the Board of Directors, provided, however, that no amendment or termination shall adversely affect the right of a Participant to receive a severance benefit that the Participant has accrued on account of his termination of employment as a result of a Change in Control.

<u>Section 7.2 After Change in Control</u>. Notwithstanding the foregoing, the Plan may not be amended or participation discontinued after the effective time of a Change in Control. For purposes of this Plan, the "effective time" of a Change in Control shall have the same meaning provided in the agreement governing the transactions which give rise to the Change in Control.

## ARTICLE VIII

## GENERAL

<u>Section 8.1 Payment Out of General Assets</u>. The benefits and costs of this Plan shall be paid by a Member Company out of its general assets.

Section 8.2 Welfare Benefit Plan. This Plan is intended to be an employee welfare benefit plan, as defined in Section 3(1), Subtitle A of Title 1 of ERISA. The Plan will be interpreted to effectuate this intent.

Section 8.3 Gender. The masculine pronoun shall include the feminine pronoun and the feminine pronoun shall include the masculine pronoun and the singular pronoun shall include the plural pronoun and the plural pronoun shall include the singular pronoun, unless the context clearly indicates otherwise.

Section 8.4 Limitation on Participant's Rights. Nothing in this Plan shall be construed to guarantee terminated Eligible Employees any right to be recalled or rehired by a Member Company.

Section 8.5 Severability. If any provision of this Plan shall be held illegal or invalid, the illegality or invalidity shall not affect the remaining parts, which shall be enforced as if the illegal or invalid provision had not been included in this Plan.

**Exhibit 10.1**

## GREATER BAY BANCORP SEVERANCE PLAN I

### Amended and Restated as of January 1, 2005

### ARTICLE I

### PURPOSE

GREATER BAY BANCORP (hereinafter referred to as the "Company") established, effective as of January 1, 1998, the Termination & Layoff Pay Plan I to provide severance benefits to eligible Employees whose employment terminates in connection with a Layoff or Termination (as those items were defined in such plan). The Company hereby amends, restates and renames such plan as the Severance Plan I, effective as of January 1, 2005 and limits participation to Employees whose employment terminated in connection with a Layoff, in accordance with the terms set forth hereunder. The intent of the plan is to ensure all employees have reasonable protection related to a Layoff event as specified herein.

### ARTICLE II

### EFFECTIVE DATE

All of the policies and practices of each Member Company regarding severance, or similar payments upon termination of employment in connection with a Layoff are hereby superseded by this plan which shall be known as the GREATER BAY BANCORP Severance Plan I (the "Plan"), as originally established January 1, 1998 and as amended and restated effective January 1, 2005.

### ARTICLE III

### DEFINITIONS

Section 3.1 Affiliated Company means:

     (a) Any corporation (other than the Company) that is included in a controlled group of corporations, within the meaning of Code Section 414(b), that includes the Company, and

(b) Any trade or business (other than the Company) that is under common control with the Company within the meaning of Code Section 414(c), and

(c) Any member (other than the Company) of an affiliated service group, within the meaning of Code Section 414(m), that includes the Company, and

(d) Any other entity required to be aggregated with the Company pursuant to regulations under Code Section 414(o).

Section 3.2 Base Benefit means the severance benefit payable to a Participant in accordance with Articles IV and V of the Plan, the amount of which is based upon such Participant's Pay and his title or position in a Member Company as of the date he terminates employment with the Member Company on account of a Layoff.

Section 3.3 Board of Directors means the board of directors of the Company.

Section 3.4 Calculated Severance means the severance benefit payable to a Participant in accordance with Articles IV and V of the Plan, the amount of which is based upon such Participant's full Years of Service with a Member Company as of the date the Participant terminates employment with a Member Company on account of a Layoff.

Section 3.5 Code means the Internal Revenue Code of 1986, as amended.

Section 3.6 Committee means the Benefits Administration Committee appointed by the Compensation Committee of the Company's Board of Directors.

Section 3.7 Company means GREATER BAY BANCORP.

Section 3.8 Effective Date means January 1, 2005.

Section 3.9 Employee means (1) any full-time employee of a Member Company or (2) any regular part-time employee of a Member Company. For purposes of this Section 3.9, "full-time employee" shall mean an employee of a Member Company who is regularly scheduled to work at least forty (40) hours per week for twelve (12) months each year. Notwithstanding the foregoing, with respect to employees of a Member Company which requires fewer than forty (40) hours per week for classification as a full-time employee, "full-time employee" shall be defined according to such Member Company's administrative policy and practice. "Regular part-time" employee shall mean any employee of a Member Company who is regularly scheduled to work at least twenty (20) hours per week for twelve (12) months each year, but fewer hours than necessary to classify him as a full-time employee.

Section 3.10 ERISA means the Employee Retirement Income Security Act of 1974, as amended.

Section 3.11 Executive Officer means a person who is an officer of a Member Company within the meaning of Section 16 of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

Section 3.12 Layoff means the termination of employment due to a business-based reduction in force including, but not limited to, cost reduction, business or process

reorganization/re-engineering, reassignment of duties, lack of/insufficient duties, or elimination of a position.

Section 3.13 Leave of Absence means a period of absence from regular employment which is approved by the Member Company in a non-discriminatory manner for reasons such as, but not limited to, sickness, disability, education, jury duty, convenience to a Member Company, maternity or paternity leave, family leave, or for periods of military duty during which the Employee's reemployment rights are protected by law.

Section 3.14 Major Business Unit means CAPCO, Matsco, Greater Bay Capital, and such other divisions or business units as designated by the Company's Chief Executive Officer.

Section 3.15 Member Company means the Company or an Affiliated Company, provided that the Compensation Committee of the Company's Board of Directors consents to the participation of any such Affiliated Company in the Plan with respect to eligible Employees of such Affiliated Company.

Section 3.16 Participant means an Employee who satisfies the requirements under Section 4.1 of the Plan.

Section 3.17 Pay means an Employee's current annual rate of regular base salary or wages on the date of the Participant's termination of employment with a Member Company on account of a Layoff, excluding all other extra pay such as bonuses, overtime, commissions, premiums, supplements, imputed income, and living, auto, or other allowances.

Section 3.18 Plan means the Greater Bay Bancorp Severance Plan I.

Section 3.19 Plan Year means each twelve (12) consecutive month period from January 1 through December 31.

Section 3.20 Severance Benefit means the sum of any Base Benefit and any Calculated Severance to which a Participant is entitled in accordance with Articles IV and V.

Section 3.21 Year of Service means a twelve (12)-continuous month period beginning on an Employee's most recent date of hire (or rehire), and each twelve (12)-continuous month period beginning on the anniversary of such hire (or rehire) date, during which the Employee remains continuously employed by a Member Company.

## ARTICLE IV

## ELIGIBILITY FOR BENEFITS

Section 4.1 Employees Eligible for Severance Benefits. Except as provided in this Section 4.1 and in Section 4.2, and subject to Section 5.11, an Employee whose employment is terminated by a Member Company on or after the Effective Date shall be eligible for a Severance Benefit if:

        (a) Subject to Section 4.2, the Employee's employment is terminated as a result of a Layoff; and

        (b) The Employee executes a waiver and release agreement in such

form as determined by the Committee (the "Waiver and Release Agreement") and returns the Waiver and Release Agreement to the Member Company within the time period specified in the Waiver and Release Agreement.

Section 4.2 Employees Not Eligible for Severance Benefits. An Employee shall not be entitled to a Severance Benefit set forth in Article V if:

(a) The Employee's employment is terminated for reasons other than Layoff; or

(b) The Employee's employment is terminated by reason of a Change in Control as that term is defined in the Greater Bay Bancorp Change in Control Pay Plan I; or

(c) The Employee has in force an employment contract or executive severance agreement with a Member Company which includes provision for the payment of severance benefits upon the termination of his employment with the Member Company as a result of a Layoff, unless such severance benefits are less than the Severance Benefit provided for in the Plan; or

(d) With respect to termination of employment resulting from a Layoff, the Employee is offered employment by a Member Company in another position of comparable pay and status to the position held immediately prior to the Layoff, regardless of whether he accepts the offer; or

(e) The Employee fails to perform his regular assigned job duties through the date specified by a Member Company as his termination date; or

(f) The Employee fails to return a properly executed Waiver and Release Agreement on a timely basis.

For purposes of this Section 4.2, a "position of comparable pay and status" shall mean a position with not less than one hundred percent (100%) of the Pay, bonus opportunity and benefits of the position held by the Employee prior to his termination of employment and with a similar scope of duties and responsibilities to such prior position. In addition, a position will not be considered a position of comparable pay and status if an Employee is required to increase his normal commute to reach a new worksite by 35 miles or more each way. Notwithstanding the foregoing, the Committee reserves the right to make decisions based on the facts and circumstances of individual cases as to whether a position is of comparable pay and status to that held by an Employee prior to his employment termination, provided that the Employee may appeal any such decision pursuant to the provision of Section 6.5.

ARTICLE V

## SEVERANCE BENEFITS

<u>Section 5.1 Calculation of Base Benefit. Subject to the provisions of Sections 4.1, 4.2, and 5.11, a Participant whose employment is terminated as a result of a Layoff shall be entitled to receive a Base Benefit under this Plan as follows:</u>

(a) <u>Senior Management Council Member (SMC) or President of a Bank or Major Business Unit</u>. A Participant who is a SMC Member (other than an Executive Officer) and an employee of a Member Company or a Major Business Unit President of a Member Company (other than an Executive Officer) shall be entitled to receive a Base Benefit equal to five (5) months of Pay in addition to any Calculated Severance to which the Participant is entitled, if any.

(b) <u>Business Level President, Executive Vice President or Senior Vice President</u>. A Participant who is a President, an Executive Vice President or Senior Vice President of a Member Company (other than an Executive Officer, SMC Member or Major Business Unit President) shall be entitled to receive a Base Benefit equal to four (4) months of Pay in addition to any Calculated Severance to which the Participant is entitled, if any.

(c) <u>Vice President/Assistant Vice President</u>. A Participant who is a Vice President or an Assistant Vice President of a Member Company shall be entitled to receive a Base Benefit equal to two (2) months of Pay in addition to any Calculated Severance to which the Participant is entitled, if any.

(d) <u>Staff - Exempt and Non-Exempt</u>. A Participant who is an exempt or non-exempt Employee of a Member Company shall be entitled to receive a Base Benefit equal to one (1) month of Pay in addition to any Calculated Severance to which the Participant is entitled, if any.

<u>Section 5.2 Determination of Calculated Severance. Subject to the provisions of Sections 4.1, 4.2, and 5.11, a Participant whose employment is terminated as a result of a Layoff shall be entitled to receive Calculated Severance under this Plan, based on the Participant's full Years of Service with a Member Company, equal to the amount of Pay that would have been payable for the number of weeks determined under the following table:</u>

| No. of Full Years of Service | No of Weeks Per Full Year of Service |
| --- | --- |
| Less than 1 year | 0 weeks |
| 1 year to 4 years | 1 week |
| 5 years to 10 years | 2 weeks |
| 11 years or more | 3 weeks |

Section 5.3 <u>Maximum Severance Benefit</u>. Notwithstanding anything to the contrary contained herein, the maximum Severance Benefit payable to a Participant upon a termination of employment on account of a Layoff is twelve (12) months of Pay.

<u>Section 5.4 Continued Insurance Benefits. Provided that the Participant timely elects</u>

continued coverage under the Consolidated Omnibus Budge Reconciliation Act of 1985 ("COBRA"), the Member Company shall pay that portion of the premiums of each Participant's group medical, dental and vision coverage, including coverage for the Participant's eligible dependents, that the Member Company regularly paid prior to the Participant's termination date for the period during which the Participant is eligible for a Severance Benefit under Sections 5.1 and 5.2 (the "Continuation Period"). Such premium payments shall continue for the duration of the Continuation Period; provided, however, that no such premium payments shall be made following the effective date of the Participant's coverage by a medical, dental or vision insurance plan of a subsequent employer. Each Participant shall be required to notify the Member Company immediately if the Participant becomes covered by a medical, dental or vision insurance plan of a subsequent employer.

No provision of this Plan will affect the continuation coverage rules under COBRA, except that the Member Company's payment of any applicable insurance premiums during the Continuation Period will be credited as payment by the Participant for purposes of the Participant's payments required under COBRA. Therefore, the period during which a Participant may elect to continue the Member Company's group medical coverage at his own expense under COBRA, the length of time during which COBRA coverage will be made available to the Participant, and all other rights and obligations of the Participant under COBRA (except the obligation to pay insurance premiums that the Member Company pays during the Continuation Period) will be applied in the same manner that such rules would apply in the absence of this Plan. At the conclusion of the Continuation Period, the Participant shall be responsible for the entire payment of premiums required under COBRA for the duration of the COBRA continuation period. For purposes of this Section 5.4, applicable premiums that will be paid by the Member Company during the Continuation Period shall not include any amounts payable by the Participant under a Section 125 health care reimbursement plan, which amounts, if any, are the sole responsibility of the Participant.

Section 5.5 Other Employee Benefits. All other employee benefits (such as life insurance, disability coverage, and retirement plan coverage) terminate as of the Participant's termination date (except to the extent that a conversion privilege may be available thereunder).

Section 5.6 Golden Parachute Restriction.

(a) In General. Notwithstanding anything above in this Article V, if a Participant is a "disqualified individual" (as defined in Section 280G(c) of the Code), and the Severance Benefit provided for in Sections 5.1 and 5.2, together with any other payments which the Participant has the right to receive from a Member Company would constitute a "parachute payment" (as defined in Section 280G(b)(2) of the Code), the Severance Benefit shall be reduced. The reduction shall be in an amount so that the present value of the total amount received by the Participant from a Member Company will be One Dollar ($1.00) less than three (3) times the Participant's base amount (as defined in Section 280G of the Code) and so that no portion of the amounts received by the Participant shall be subject to the excise tax imposed by Section 4999 of the Code.

(b) Deferred Compensation and Reimbursements Exception. In no circumstances will a Member Company reduce the Severance Benefits payable to a Participant on account of the restrictions of this Section 5.6 by the amounts the Participant has the right to receive under an executive deferred compensation plan of the Member Company

(Deferred Compensation Plan), amounts paid or payable to the Participant to reimburse him/her either fully or partially for excise tax and/or income tax on the reimbursement (gross up amounts), or amounts paid or payable on the Participant as indemnification for attorney's fees and legal expenses.

(c) Determination of Reduction. The determination as to whether any reduction in the Severance Benefit is necessary shall be made by the Participant's Member Company in good faith, and the determination shall be conclusive and binding on the Participant.

(d) Repayment of Excess Amount. If through error or otherwise the Participant should receive payments under this Plan, together with other payments the Participant has the right to receive from a Member Company, excluding Deferred Compensation Plan payments in excess of one dollar ($1.00) less than three times his base amount, the Participant shall immediately repay the excess to the Member Company upon notification that an overpayment has been made.

Section 5.7 Payment of Benefits. The Plan shall pay a Severance Benefit to a Participant whose employment is terminated on account of a Layoff in the form of a lump sum or equal installments payable over a period not to exceed twelve (12) months, as the Committee in its sole discretion may determine. The Plan shall make lump sum distributions as soon as administratively practicable and in no event later than thirty (30) days following the receipt by the Company of a timely and properly executed Waiver and Release Agreement. The Plan shall make installment payments in accordance with the Member Company's normal payroll schedule beginning with the first payroll date as soon as administratively practicable following receipt by the Company of a timely and properly executed Waiver and Release Agreement.

Section 5.8 Payment Offset. A Member Company reserves the right to offset the Severance Benefits payable under Sections 5.1 and 5.2 by any advance, loan or other monies the Participant owes the Member Company. All Severance Benefit payments under the Plan will be subject to applicable withholding for federal, state and local taxes.

Section 5.9 Repayment Upon Re-employment. In the event of a Participant's reemployment by a Member Company during the period of time in respect of which Calculated Severance pursuant to Section 5.2 has been paid in a lump sum, the Member Company shall require such Participant to repay to the Member Company all or a portion of such Calculated Severance as a condition of reemployment. The amount required to be repaid shall equal the Participant's weekly Pay for the total number of weeks for which the Participant was eligible under Section 5.2 minus the Participant's weekly Pay for the number of weeks that have elapsed since the Participant's termination of employment. If the Calculated Severance is paid in installments, the installment payments will stop upon reemployment with a Member Company.

Section 5.10 Unfunded Plan. The obligations of a Member Company under this Plan may be funded through contributions to a trust or otherwise, but the obligations of the Member Company are not required to be funded under this Plan unless required by law. Nothing contained in this Plan shall give a Participant any right, title or interest in any property of the Member Company.

Section 5.11 Prohibition Against Golden Parachute Payments. Notwithstanding any provision of the Plan to the contrary, no Participant who is an institution-affiliated

party as the term is defined in Section 359.1(h) of the Federal Deposit Insurance Corporation Rules and Regulations ("FDIC Rules and Regs") shall be entitled to the payment of any Severance Benefit under the Plan to the extent that such payment shall be deemed a "golden parachute payment" as the term is defined in FDIC Rules and Reg. Section 359.1(f)(i)(ii) or (iii).

ARTICLE VI

ADMINISTRATION

**Section 6.1 Plan Administration.** The Company shall be the administrator of the Plan for purposes of Section 3(16) of ERISA and shall have responsibility for complying with any ERISA reporting and disclosure rules applicable to the Plan for any Plan Year.

**Section 6.2 Plan Committee.** In all respects other than as provided in Section 6.1, the Plan shall be administered and operated by the Committee. The Committee shall have all powers necessary to supervise the administration of the Plan and control its operations. In addition to any powers and authority conferred to the Committee elsewhere in the Plan or by law, the Committee shall have, by way of illustration but not by way of limitation, the following discretionary powers and authority:

    (a) To allocate fiduciary responsibilities among the named fiduciaries and to designate one or more other persons to carry out fiduciary responsibilities. However, no allocation or delegation under this Section 6.2(a) shall be effective until the person or persons to whom the responsibilities have been allocated or delegated agree to assume the responsibilities.

    (b) To designate agents to carry out responsibilities relating to the Plan, other than fiduciary responsibilities.

    (c) To employ such legal, accounting, clerical, and other assistance as it may deem appropriate in carrying out the provisions of this Plan, including one or more persons to render advice with regard to any responsibility any fiduciary may have under the Plan.

    (d) To establish rules and procedures from time to time for the conduct of the Committee's business and the administration and effectuation of this Plan.

    (e) To administer, interpret, construe and apply this Plan. To decide all questions which may arise or which may be raised under this Plan by any Employee, Participant, former Participant or other person whatsoever, including but not limited to all questions relating to eligibility to participate in the Plan, the amount of service of any Participant, and the amount of benefits to which any Participant may be entitled.

    (f) To determine the manner in which the Severance Benefits of this Plan, or any part thereof, shall be administered.

    (g) To perform or cause to be performed such further acts as it may deem to be necessary, appropriate or convenient in the efficient administration of the Plan.

Any action taken in good faith by the Committee in the exercise of discretionary authority conferred upon it by this Plan shall be conclusive and binding upon the Participants. All discretionary powers conferred upon the Committee shall be absolute. However, all discretionary powers shall be exercised in a uniform and nondiscriminatory manner.

Section 6.3 Named Fiduciary. The members of the Committee shall be named fiduciaries with respect to this Plan for purposes of Section 402 of ERISA.

Section 6.4 Indemnification of Committee. The Company shall, to the extent permitted by law, by the purchase of insurance or otherwise, indemnify and hold harmless each member of the Committee and each other fiduciary with respect to this Plan for liabilities or expenses they and each of them incur in carrying out their respective duties under the Plan, other than for any liabilities or expenses arising out of such fiduciary's gross negligence or willful misconduct. A fiduciary shall not be responsible for any breach of responsibility of any other fiduciary except to the extent provided in Section 405 of ERISA.

Section 6.5 Claims Procedure.

(a) Applications for Benefits and Inquiries. Any application for benefits, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Committee in writing by an applicant (or his authorized representative). The address for the Committee is:

Plan Committee

Greater Bay Bancorp

1900 University Avenue, Suite 600

East Palo Alto, CA 94303

(b) Denial of Claims. In the event that any application for benefits is denied in whole or in part, the Committee must provide the applicant with written or electronic notice of the denial of the application, and of the applicant's right to review the denial. Any electronic notice will comply with the regulations of the U.S. Department of Labor. The notice of denial will be set forth in a manner designed to be understood by the applicant and will include the following:

(i) the specific reason or reasons for the denial;

(ii) references to the specific Plan provisions upon which the denial is based;

(iii) a description of any additional information or material that the Committee needs to complete the review and an explanation of why such information or material is necessary; and

(iv) an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the applicant's right to bring a civil action

under section 502(a) of ERISA following a denial on review of the claim, as described in Section 6.5(d) below.

This notice of denial will be given to the applicant within ninety (90) days after the Committee receives the application, unless special circumstances require an extension of time, in which case, the Committee has up to an additional ninety (90) days for processing the application. If an extension of time for processing is required, written notice of the extension will be furnished to the applicant before the end of the initial ninety (90) day period.

This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Committee is to render its decision on the application.

(c) Request for a Review. Any person (or that person's authorized representative) for whom an application for benefits is denied, in whole or in part, may appeal the denial by submitting a request for a review to the Committee within sixty (60) days after the application is denied. A request for a review shall be in writing and shall be addressed to:

Plan Committee

Greater Bay Bancorp

1900 University Avenue, Suite 600

East Palo Alto, CA 94303

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent. The applicant (or his representative) shall have the opportunity to submit (or the Committee may require the applicant to submit) written comments, documents, records, and other information relating to his claim. The applicant (or his representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his claim. The review shall take into account all comments, documents, records and other information submitted by the applicant (or his representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(d) Decision on Review. The Committee will act on each request for review within sixty (60) days after receipt of the request, unless special circumstances require an extension of time (not to exceed an additional sixty (60) days), for processing the request for a review. If an extension for review is required, written notice of the extension will be furnished to the applicant within the initial sixty (60) day period. This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Committee is to render its decision on the review. The Committee will give prompt, written or electronic notice of its decision to the applicant. Any electronic notice will comply with the regulations of the U.S. Department of Labor. In the event that the Committee confirms the denial of the application for

benefits in whole or in part, the notice will set forth, in a manner calculated to be understood by the applicant, the following:

(i) the specific reason or reasons for the denial;

(ii) references to the specific Plan provisions upon which the denial is based;

(iii) a statement that the applicant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his claim (excluding those protected by legal privilege); and

(iv) a statement of the applicant's right to bring a civil action under section 502(a) of ERISA.

(e) <u>Rules and Procedures</u>. The Committee will establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out its responsibilities in reviewing benefit claims. The Committee may require an applicant who wishes to submit additional information in connection with an appeal from the denial of benefits to do so at the applicant's own expense.

(f) <u>Exhaustion of Remedies</u>. No legal action for benefits under the Plan may be brought until the claimant (i) has submitted a written application for benefits in accordance with the procedures described by Section 6.5(a) above, (ii) has been notified by the Committee that the application is denied, (iii) has filed a written request for a review of the application in accordance with the appeal procedure described in Section 6.5(c) above, and (iv) has been notified that the Committee has denied the appeal. Notwithstanding the foregoing, if the Committee does not respond to a Participant's claim or appeal within the relevant time limits specified in this Section 6.5, the Participant may bring legal action for benefits under the Plan pursuant to Section 502(a) of ERISA.

## ARTICLE VII

## AMENDMENT AND TERMINATION

This Plan may be amended from time to time, or terminated at the discretion of the Board of Directors by a written resolution adopted by a majority of the Board of Directors; provided, however, that no amendment or termination shall adversely affect the right to any unpaid Severance Benefit of a Participant whose Layoff termination date has occurred prior to such amendment or termination of the Plan.

## ARTICLE VIII

## GENERAL

<u>Section 8.1 Payment Out of General Assets</u>. The benefits and costs of this Plan shall be paid by the Company and each Member Company out of its general assets.

<u>Section 8.2 Welfare Benefit Plan</u>. This Plan is intended to be an employee welfare benefit plan, as defined in Section 3(1), Subtitle A of Title 1 of ERISA. The Plan will

be interpreted to effectuate this intent.

Section 8.3 Gender. The masculine pronoun shall include the feminine pronoun and the feminine pronoun shall include the masculine pronoun and the singular pronoun shall include the plural pronoun and the plural pronoun shall include the singular pronoun, unless the context clearly indicates otherwise.

Section 8.4 Limitation on Participant's Rights. Nothing in this Plan shall be construed to guarantee terminated Employees any right to be recalled or rehired by a Member Company.

Section 8.5 Severability. If any provision of the Plan shall be held illegal or invalid, the illegality or invalidity shall not affect the remaining parts, which shall be enforced as if the illegal or invalid provision had not been included in this Plan.

**Exhibit 10.2**

## GREATER BAY BANCORP SEVERANCE PLAN II

### Amended and Restated as of January 1, 2005

### ARTICLE I

### PURPOSE

GREATER BAY BANCORP (the "Company") established, effective as of January 1, 1998, and amended as of March 23, 1999, the Termination & Layoff Pay Plan II to provide severance benefits to selected executives whose employment terminates in connection with a Layoff or Termination (as such terms were defined in the Termination & Layoff Plan II). The Company hereby amends, restates and renames such plan as the Severance Plan II, effective as of January 1, 2005, to provide severance benefits to such executives who are deemed Eligible Employees and whose employment terminates in connection with a Layoff, in accordance with the terms set forth hereunder. The intent of the plan is to ensure all Eligible Employees have reasonable protection related to a Layoff event as specified herein.

### ARTICLE II

### EFFECTIVE DATE

All of the policies and practices of each Member Company regarding severance, or similar payments to Eligible Employees upon termination of employment in connection with a Layoff are hereby superseded by this plan which shall be known as the GREATER BAY BANCORP Severance Plan II (the "Plan"), as originally established January 1, 1998, amended March 23, 1999, and as amended and restated effective January 1, 2005.

### ARTICLE III

### DEFINITIONS

Section 3.1 Affiliated Company means:

(a) Any corporation (other than the Company) that is included in a controlled group of corporations, within the meaning of Code Section 414(b), that includes the Company, and

(b) Any trade or business (other than the Company) that is under common control with the Company within the meaning of Code Section 414(c), and

(c) Any member (other than the Company) of an affiliated service group, within the meaning of Code Section 414(m), that includes the Company, and

(d) Any other entity required to be aggregated with the Company pursuant to regulations under Code Section 414(o).

Section 3.2 Base Benefit means the severance benefit payable to a Participant in accordance with Articles IV and V of the Plan, the amount of which is based upon such Participant's Pay and his title or position with a Member Company as of the date he terminates employment with the Member Company on account of a Layoff.

Section 3.3 Board of Directors means the board of directors of the Company.

Section 3.4 Calculated Severance means the severance benefit payable to a Participant in accordance with Articles IV and V of the Plan, the amount of which is based upon such Participant's full Years of Service with a Member Company as of the date the Participant terminates employment with a Member Company on account of a Layoff.

Section 3.5 Code means the Internal Revenue Code of 1986, as amended.

Section 3.6 Committee means the Benefits Administration Committee appointed by the Compensation Committee of the Company's Board of Directors.

Section 3.7 Company means GREATER BAY BANCORP.

Section 3.8 Effective Date means January 1, 2005.

Section 3.9 Employee means (1) any full-time employee of a Member Company or (2) any regular part-time employee of a Member Company. For purposes of this Section 3.9, "full-time employee" shall mean an employee of a Member Company who is regularly scheduled to work at least forty (40) hours per week for twelve (12) months each year. Notwithstanding the foregoing, with respect to employees of a Member Company which requires fewer than forty (40) hours per week for classification as a full-time employee, "full-time employee" shall be defined according to such Member Company's administrative policy and practice. "Regular part-time" employee shall mean any employee of a Member Company who is regularly scheduled to work at least twenty (20) hours per week for twelve (12) months each year, but fewer hours than necessary to classify him as a full-time employee.

Section 3.10 Eligible Employee means an Employee who is a member of the Company's Managing Committee (MC) and an Employee of a Member Company.

Section 3.11 ERISA means the Employee Retirement Income Security Act of 1974, as amended.

Section 3.12 Layoff means the termination of employment due to a business-based reduction in force, including, but not limited to, cost reduction, business or process reorganization/re-engineering, reassignment of duties, lack of/insufficient duties, or elimination of a position.

Section 3.13 Leave of Absence means a period of absence from regular employment which is approved by the Member Company in a non-discriminatory manner for reasons such as, but not limited to, sickness, disability, education, jury duty, convenience to a Member Company, maternity or paternity leave, family leave, or for periods of military duty during which the Employee's reemployment rights are protected by law.

Section 3.14 Member Company means the Company or an Affiliated Company, provided that the Compensation Committee of the Company's Board of Directors consents to the participation of any such Affiliated Company in the Plan with respect to Eligible Employees of such Affiliated Company.

Section 3.15 Participant means an Eligible Employee who satisfies the requirements under Section 4.1 of the Plan.

Section 3.16 Pay means an Eligible Employee's current annual rate of regular base salary or wages on the date of the Participant's termination of employment with a Member Company on account of a Layoff, excluding all other extra pay such as bonuses, overtime, commissions, premiums, supplements, imputed income and living, auto or other allowances.

Section 3.17 Plan means the Greater Bay Bancorp Severance Plan II.

Section 3.18 Plan Year means each twelve (12) consecutive month period from January 1 through December 31.

Section 3.19 Severance Benefit means the sum of any Base Benefit and any Calculated Severance to which a Participant is entitled in accordance with Articles IV and V.

Section 3.20 Year of Service means a twelve (12)-continuous month period beginning on an Employee's most recent date of hire (or rehire), and each twelve (12)-continuous month period beginning on the anniversary of such hire (or rehire) date, during which the Employee remains continuously employed by a Member Company.

## ARTICLE IV

## ELIGIBILITY FOR BENEFITS

Section 4.1 Employees Eligible for Severance Benefits. Except as provided in this Section 4.1 and in Section 4.2, and subject to Section 5.11, an Eligible Employee whose employment is terminated by a Member Company on or after the Effective Date shall be eligible for a Severance Benefit if:

>        (a) Subject to Section 4.2, the Eligible Employee's employment is terminated as a result of a Layoff; and

>        (b) The Eligible Employee executes a waiver and release agreement in

such form as determined by the Committee (the "Waiver and Release Agreement") and returns the Waiver and Release Agreement to the Member Company within the time period specified in the Waiver and Release Agreement.

Section 4.2 Employees Not Eligible for Severance Benefits. An Eligible Employee shall not be entitled to a Severance Benefit set forth in Article V if:

(a) The Employee's employment is terminated for reasons other than Layoff; or

(b) The Employee's employment is terminated by reason of a Change in Control as that term is defined in the Greater Bay Bancorp Change in Control Plan II; or

(c) The Employee has in force an employment contract or executive severance agreement with a Member Company which includes provision for the payment of severance benefits upon the termination of his employment with the Member Company as a result of a Layoff, unless such severance benefits are less than the Severance Benefit provided for in the Plan; or

(d) With respect to termination of employment resulting from a Layoff, the Employee is offered employment by a Member Company in another position of comparable pay and status to the position held immediately prior to the Layoff, regardless of whether he accepts the offer; or

(e) The Employee fails to perform his regular assigned job duties through the date specified by a Member Company as his termination date; or

(f) The Employee fails to return a properly executed Waiver and Release Agreement on a timely basis.

For purposes of this Section 4.2, a "position of comparable pay and status" shall mean a position with not less than one hundred percent (100%) of the Pay, bonus opportunity and benefits of the position held by the Employee prior to his termination of employment and with a similar scope of duties and responsibilities to such prior position. In addition, a position will not be considered a position of comparable pay and status if an Employee is required to increase his normal commute to reach a new worksite by 35 miles or more each way. Notwithstanding the foregoing, the Committee reserves the right to make decisions based on the facts and circumstances of individual cases as to whether a position is of comparable pay and status to that held by an Employee prior to his employment termination, provided that the Employee may appeal any such decision pursuant to the provision of Section 6.5.

ARTICLE V

SEVERANCE BENEFITS

Section 5.1 Calculation of Base Benefit. Subject to the provisions of Sections 4.1, 4.2, and 5.11, a Participant whose employment is terminated as a result of a Layoff shall be entitled to receive a Base Benefit under this Plan as follows:

(a) CEO. A Participant who is the CEO shall be entitled to receive a Base Benefit equal to twenty-four (24) months of Pay.

(b) All Other Participants. Each other Participant shall be entitled to receive a Base Benefit equal to twelve (12) months of Pay.

Section 5.2 Determination of Calculated Severance. Subject to the provisions of Sections 4.1, 4.2, and 5.11, a Participant whose employment is terminated as a result of a Layoff shall be entitled to receive Calculated Severance under this Plan, based on the Participant's full Years of Service with a Member Company, equal to the amount of Pay that would have been payable for the number of weeks determined under the following table:

| No. of Full Years of Service | No of Weeks Per Full Year of Service |
| --- | --- |
| Less than 1 year | 0 weeks |
| 1 year to 4 years | 1 week |
| 5 years to 10 years | 2 weeks |
| 11 years or more | 3 weeks |

Section 5.3 Maximum Severance Benefit. Notwithstanding anything to the contrary contained herein, the maximum Severance Benefit payable to a Participant other than the CEO upon a termination of employment on account of a Layoff is eighteen (18) months of Pay.

Section 5.4 Golden Parachute Restriction.

(a) In General. Notwithstanding anything above in this Article V, if a Participant is a "disqualified individual" (as defined in Section 280G(c) of the Code), and the severance benefit provided for in Sections 5.1 and 5.2, together with any other payments which the Participant has the right to receive from a Member Company would constitute a "parachute payment" (as defined in Section 280G(b)(2) of the Code), the Severance Benefit shall be reduced. The reduction shall be in an amount so that the present value of the total amount received by the Participant from a Member Company will be One Dollar ($1.00) less than three (3) times the Participant's base amount (as defined in Section 280G of the Code) and so that no portion of the amounts received by the Participant shall be subject to the excise tax imposed by Section 4999 of the Code.

(b) Deferred Compensation and Reimbursements Exception. In no circumstances will a Member Company reduce the Severance Benefits payable to a Participant on account of the restrictions of this Section 5.4 by the amounts the Participant has the right to receive under an executive deferred compensation plan of the Company (Deferred Compensation Plan), amounts paid or payable to the Participant to reimburse him either fully or partially for excise tax and/or income tax on the reimbursement (gross up amounts), or amounts paid or payable on the Participant as indemnification for attorney's fees and legal expenses.

(c) <u>Determination of Reduction</u>. The determination as to whether any reduction in the Severance Benefit is necessary shall be made by a Member Company in good faith, and the determination shall be conclusive and binding on the Participant.

(d) <u>Repayment of Excess Amount</u>. If through error or otherwise the Participant should receive payments under this Plan, together with other payments the Participant has the right to receive from a Member Company, excluding Deferred Compensation Plan payments in excess of one dollar ($1.00) less than three times his base amount, the Participant shall immediately repay the excess to the Member Company upon notification that an overpayment has been made.

<u>Section 5.5 Continued Insurance Benefits. Provided that the Participant timely elects continued coverage under the Consolidated Omnibus Budge Reconciliation Act of 1985 ("COBRA"), the Member Company shall pay that portion of the premiums of each Participant's group medical, dental and vision coverage, including coverage for the Participant's eligible dependents, that the Member Company regularly paid prior to the Participant's termination date for the period during which the Participant is eligible for a Severance Benefit under Sections 5.1 and 5.2 (the "Continuation Period"). Such premium payments shall continue for the duration of the Continuation Period; provided, however, that no such premium payments shall be made following the effective date of the Participant's coverage by a medical, dental or vision insurance plan of a subsequent employer. Each Participant shall be required to notify the Member Company immediately if the Participant becomes covered by a medical, dental or vision insurance plan of a subsequent employer.</u>

No provision of this Plan will affect the continuation coverage rules under COBRA, except that the Member Company's payment of any applicable insurance premiums during the Continuation Period will be credited as payment by the Participant for purposes of the Participant's payments required under COBRA. Therefore, the period during which a Participant may elect to continue the Member Company's group medical coverage at his own expense under COBRA, the length of time during which COBRA coverage will be made available to the Participant, and all other rights and obligations of the Participant under COBRA (except the obligation to pay insurance premiums that the Member Company pays during the Continuation Period) will be applied in the same manner that such rules would apply in the absence of this Plan. At the conclusion of the Continuation Period, the Participant shall be responsible for the entire payment of premiums required under COBRA for the duration of the COBRA continuation period. For purposes of this Section 5.5, applicable premiums that will be paid by the Member Company during the Continuation Period shall not include any amounts payable by the Participant under a Section 125 health care reimbursement plan, which amounts, if any, are the sole responsibility of the Participant.

<u>Section 5.6 Other Employee Benefits. All other employee benefits (such as life insurance, disability coverage, and retirement plan coverage) terminate as of the Participant's termination date (except to the extent that a conversion privilege may be available thereunder).</u>

<u>Section 5.7 Payment of Benefits. The Plan shall pay a Severance Benefit to a Participant whose employment is terminated on account of a Layoff in the form of a lump sum or equal installments payable over a period not to exceed twenty-four (24) months, as the Committee in its sole discretion may determine. The Plan shall make lump sum distributions as soon as administratively practicable and in no event later than thirty (30) days following the receipt by the Company of a timely and properly executed Waiver and Release Agreement. The Plan shall make installment payments</u>

in accordance with the Member Company's normal payroll schedule beginning with the first payroll date as soon as administratively practicable following receipt by the Company of a timely and properly executed Waiver and Release Agreement.

Section 5.8 Payment Offset. A Member Company reserves the right to offset the Severance Benefits payable under Sections 5.1 and 5.2 by any advance, loan or other monies the Participant owes the Member Company. All Severance Benefit payments under the Plan will be subject to applicable withholding for federal, state and local taxes.

Section 5.9 Repayment Upon Re-employment. In the event of a Participant's reemployment by a Member Company during the period of time in respect of which Calculated Severance pursuant to Section 5.2 has been paid in a lump sum, the Member Company shall require such Participant to repay to the Member Company all or a portion of such Calculated Severance as a condition of reemployment. The amount required to be repaid shall equal the Participant's weekly Pay for the total number of weeks for which the Participant was eligible under Section 5.2 minus the Participant's weekly Pay for the number of weeks that have elapsed since the Participant's termination of employment. If the Calculated Severance is paid in installments, the installment payments will stop upon reemployment with a Member Company.

Section 5.10 Unfunded Plan. The obligations of a Member Company under this Plan may be funded through contributions to a trust or otherwise, but the obligations of the Member Company are not required to be funded under this Plan unless required by law. Nothing contained in this Plan shall give a Participant any right, title or interest in any property of a Member Company.

Section 5.11 Prohibition Against Golden Parachute Payments. Notwithstanding any provision of the Plan to the contrary, no Participant who is an institution-affiliated party as the term is defined in Section 359.1(h) of the Federal Deposit Insurance Corporation Rules and Regulations ("FDIC Rules and Regs") shall be entitled to the payment of any Severance Benefit under the Plan to the extent that such payment shall be deemed a "golden parachute payment" as the term is defined in FDIC Rules and Reg. Section 359.1(f)(i)(ii) or (iii).


## ARTICLE VI

## ADMINISTRATION

Section 6.1 Plan Administration. The Company shall be the administrator of the Plan for purposes of Section 3(16) of ERISA and shall have responsibility for complying with any ERISA reporting and disclosure rules applicable to the Plan for any Plan Year.

Section 6.2 Plan Committee. In all respects other than as provided in Section 6.1, the Plan shall be administered and operated by the Committee. The Committee shall have all powers necessary to supervise the administration of the Plan and control its operations. In addition to any powers and authority conferred to the Committee elsewhere in the Plan or by law, the Committee shall have, by way of illustration but not by way of limitation, the following discretionary powers and authority:

> (a) To allocate fiduciary responsibilities among the named fiduciaries and to designate one or more other persons to carry out fiduciary responsibilities. However, no allocation or delegation under this

Section 6.2(a) shall be effective until the person or persons to whom the responsibilities have been allocated or delegated agree to assume the responsibilities.

(b) To designate agents to carry out responsibilities relating to the Plan, other than fiduciary responsibilities.

(c) To employ such legal, accounting, clerical, and other assistance as it may deem appropriate in carrying out the provisions of this Plan, including one or more persons to render advice with regard to any responsibility any fiduciary may have under the Plan.

(d) To establish rules and procedures from time to time for the conduct of the Committee's business and the administration and effectuation of this Plan.

(e) To administer, interpret, construe and apply this Plan. To decide all questions which may arise or which may be raised under this Plan by any Employee, Participant, former Participant or other person whatsoever, including but not limited to all questions relating to eligibility to participate in the Plan, the amount of service of any Participant, and the amount of benefits to which any Participant may be entitled.

(f) To determine the manner in which the Severance Benefits of this Plan, or any part thereof, shall be administered.

(g) To perform or cause to be performed such further acts as it may deem to be necessary, appropriate or convenient in the efficient administration of the Plan.

Any action taken in good faith by the Committee in the exercise of discretionary authority conferred upon it by this Plan shall be conclusive and binding upon the Participants. All discretionary powers conferred upon the Committee shall be absolute. However, all discretionary powers shall be exercised in a uniform and nondiscriminatory manner.

Section 6.3 Named Fiduciary. The members of the Committee shall be named fiduciaries with respect to this Plan for purposes of Section 402 of ERISA.

Section 6.4 Indemnification of Committee. The Company shall, to the extent permitted by law, by the purchase of insurance or otherwise, indemnify and hold harmless each member of the Committee and each other fiduciary with respect to this Plan for liabilities or expenses they and each of them incur in carrying out their respective duties under the Plan, other than for any liabilities or expenses arising out of such fiduciary's gross negligence or willful misconduct. A fiduciary shall not be responsible for any breach of responsibility of any other fiduciary except to the extent provided in Section 405 of ERISA.

Section 6.5 Claims Procedure.

(a) Applications for Benefits and Inquiries. Any application for benefits, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Committee in writing by an applicant (or his authorized representative). The address for the

Committee is:

Plan Committee

Greater Bay Bancorp

1900 University Avenue, Suite 600

East Palo Alto, CA 94303

(b) <u>Denial of Claims</u>. In the event that any application for benefits is denied in whole or in part, the Committee must provide the applicant with written or electronic notice of the denial of the application, and of the applicant's right to review the denial. Any electronic notice will comply with the regulations of the U.S. Department of Labor. The notice of denial will be set forth in a manner designed to be understood by the applicant and will include the following:

(i) the specific reason or reasons for the denial;

(ii) references to the specific Plan provisions upon which the denial is based;

(iii) a description of any additional information or material that the Committee needs to complete the review and an explanation of why such information or material is necessary; and

(iv) an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the applicant's right to bring a civil action under section 502(a) of ERISA following a denial on review of the claim, as described in Section 6.5(d) below.

This notice of denial will be given to the applicant within ninety (90) days after the Committee receives the application, unless special circumstances require an extension of time, in which case, the Committee has up to an additional ninety (90) days for processing the application. If an extension of time for processing is required, written notice of the extension will be furnished to the applicant before the end of the initial ninety (90) day period.

This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Committee is to render its decision on the application.

(c) <u>Request for a Review</u>. Any person (or that person's authorized representative) for whom an application for benefits is denied, in whole or in part, may appeal the denial by submitting a request for a review to the Committee within sixty (60) days after the application is denied. A request for a review shall be in writing and shall be addressed to:

Plan Committee

Greater Bay Bancorp

1900 University Avenue, Suite 600

East Palo Alto, CA 94303

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent. The applicant (or his representative) shall have the opportunity to submit (or the Committee may require the applicant to submit) written comments, documents, records, and other information relating to his claim. The applicant (or his representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his claim. The review shall take into account all comments, documents, records and other information submitted by the applicant (or his representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(d) <u>Decision on Review</u>. The Committee will act on each request for review within sixty (60) days after receipt of the request, unless special circumstances require an extension of time (not to exceed an additional sixty (60) days), for processing the request for a review. If an extension for review is required, written notice of the extension will be furnished to the applicant within the initial sixty (60) day period. This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Committee is to render its decision on the review. The Committee will give prompt, written or electronic notice of its decision to the applicant. Any electronic notice will comply with the regulations of the U.S. Department of Labor. In the event that the Committee confirms the denial of the application for benefits in whole or in part, the notice will set forth, in a manner calculated to be understood by the applicant, the following:

(i) the specific reason or reasons for the denial;

(ii) references to the specific Plan provisions upon which the denial is based;

(iii) a statement that the applicant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his claim (excluding those protected by legal privilege); and

(iv) a statement of the applicant's right to bring a civil action under section 502(a) of ERISA.

(e) <u>Rules and Procedures</u>. The Committee will establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out its responsibilities in reviewing benefit claims. The Committee may require an applicant who wishes to submit additional information in connection with an appeal from the denial of benefits to do so at the applicant's own expense.

(f) <u>Exhaustion of Remedies</u>. No legal action for benefits under the Plan may be brought until the claimant (i) has submitted a written application for benefits in accordance with the procedures described by Section 6.5(a) above, (ii) has been notified by the Committee that the

application is denied, (iii) has filed a written request for a review of the application in accordance with the appeal procedure described in Section 6.5(c) above, and (iv) has been notified that the Committee has denied the appeal. Notwithstanding the foregoing, if the Committee does not respond to a Participant's claim or appeal within the relevant time limits specified in this Section 6.5, the Participant may bring legal action for benefits under the Plan pursuant to Section 502(a) of ERISA.

## ARTICLE VII

## AMENDMENT AND TERMINATION

This Plan may be amended from time to time, or terminated at the discretion of the Board of Directors by a written resolution adopted by a majority of the Board of Directors; provided, however, that no amendment or termination shall adversely affect the right to any unpaid Severance Benefit of a Participant whose Layoff termination date has occurred prior to such amendment or termination of the Plan.

## ARTICLE VIII

## GENERAL

Section 8.1 Payment Out of General Assets. The benefits and costs of this Plan shall be paid by the Company and each Member Company out of its general assets.

Section 8.2 Welfare Benefit Plan. This Plan is intended to be an employee welfare benefit plan, as defined in Section 3(1), Subtitle A of Title 1 of ERISA. The Plan will be interpreted to effectuate this intent.

Section 8.3 Gender. The masculine pronoun shall include the feminine pronoun and the feminine pronoun shall include the masculine pronoun and the singular pronoun shall include the plural pronoun and the plural pronoun shall include the singular pronoun, unless the context clearly indicates otherwise.

Section 8.4 Limitation on Participant's Rights. Nothing in this Plan shall be construed to guarantee terminated Employees any right to be recalled or rehired by a Member Company.

Section 8.5 Severability. If any provision of the Plan shall be held illegal or invalid, the illegality or invalidity shall not affect the remaining parts, which shall be enforced as if the illegal or invalid provision had not been included in this Plan.

**Exhibit 10.3**

**GREATER BAY BANCORP CHANGE IN CONTROL PAY PLAN I**

**Amended and Restated Effective January 1, 2005**

## ARTICLE I

## PURPOSE

GREATER BAY BANCORP (the "Company") established, effective as of January 1, 1998, the Change in Control Pay Plan I, as amended and restated effective as of August 21, 2001, to provide severance benefits to eligible Employees whose employment terminates in connection with a Change in Control. The Company hereby amends and restates such plan, effective as of January 1, 2005, in accordance with the terms set forth hereunder. The intent of the plan is to ensure all eligible Employees have reasonable protection related to any event as specified in this plan.

## ARTICLE II

## EFFECTIVE DATE

All of the policies and practices of each Member Company regarding severance, or similar payments upon employment termination on account of a Change in Control are hereby superseded by this plan which shall be known as the GREATER BAY BANCORP Change in Control Pay Plan I (the "Plan"), effective January 1, 2005.

## ARTICLE III

## DEFINITIONS

Section 3.1 <u>Affiliated Company</u> means:

(a) Any corporation (other than the Company) that is included in a controlled group of corporations, within the meaning of Code Section 414(b), that includes the Company, and

(b) Any trade or business (other than the Company) that is under common control with the Company within the meaning of Code Section 414(c), and

(c) Any member (other than the Company) of an affiliated service group, within the meaning of Code Section 414(m), that includes the Company, and

(d) Any other entity required to be aggregated with the Company pursuant to regulations under Code Section 414(o).

Section 3.2 <u>Base Benefit</u> means the severance benefit payable to a Participant in accordance with Articles IV and V of the Plan, the amount of which is based upon such Participant's Pay and his title or position in a Member Company as of the date he terminates employment with the Member Company on account of a Change in Control.

Section 3.3 <u>Board of Directors</u> means the board of directors of the Company.

Section 3.4 <u>Change in Control</u> means the first to occur of any of the following events:

(A) Any "person" (as that term is used in Section 13 and 14(d)(2) of the Securities Exchange Act of 1934 ("Exchange Act") becomes the beneficial owner (as that term is used in Section 13(d) of the Exchange Act), directly or indirectly, of 25% or more of the Company's capital stock entitled to vote in the election of directors;

(B) During any period of not more than two consecutive years, not including any period prior to the adopting of this Plan, individuals who, at the beginning of such period constitute the Board of Directors of the Company, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in clause (A), (C), (D) and (E) of this Article) whose appointment to the Board of Directors or nomination for election to the Board of Directors was approved by a vote of at least three-fourths (3/4ths) of the directors then still in office, either were directors at the beginning of the period or whose appointment or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof;

(C) The shareholders of the Company approve any consolidation or merger of the Company, other than a consolidation or merger of the Company on which the holders of the common stock of the Company immediately prior to the consolidation or merger hold more than 50% of the common stock of the surviving corporation immediately after the consolidation or merger;

(D) The shareholders of the Company approve any plan or proposal for the liquidation or dissolution of the Company; or

(E) The shareholders of the Company approve the sale or transfer of substantially all of the Company's assets to parties that are not within a "controlled group of corporations" (as defined in Code Section 1563) in which the Company is a member.

Section 3.5 Code means the Internal Revenue Code of 1986, as amended.

Section 3.6 Committee means the Benefits Administration Committee appointed by the Compensation Committee of the Company's Board of Directors.

Section 3.7 Company means GREATER BAY BANCORP.

Section 3.8 Effective Date means January 1, 2005.

Section 3.9 Employee means (1) any full-time employee of a Member Company or (2) any regular part-time employee of a Member Company. For purposes of this Section 3.9, "full-time employee" shall mean an employee of a Member Company who is regularly scheduled to work at least forty (40) hours per week for twelve (12) months each year. Notwithstanding the foregoing, with respect to employees of a Member Company which requires fewer than forty (40) hours per week for classification as a full-time employee, "full-time employee" shall be defined according to such Member Company's administrative policy and practice. "Regular part-time" employee shall mean any employee of a Member Company who is regularly scheduled to work at least twenty (20) hours per week for twelve (12) months each year, but fewer hours than necessary to classify him as a full-time employee.

Section 3.10 ERISA means the Employee Retirement Income Security Act of 1974, as amended.

Section 3.11 Leave of Absence means a period of absence from regular employment which is approved by a Member Company in a non-discriminatory manner for reasons such as, but not limited to, sickness, disability, education, jury duty,

convenience to a Member Company, maternity or paternity leave, family leave, or for periods of military duty during which the Employee's reemployment rights are protected by law.

Section 3.12 <u>Member Company</u> means the Company or an Affiliated Company, provided that the Compensation Committee of the Company's Board of Directors consents to the participation of any such Affiliated Company in the Plan with respect to eligible Employees of such Affiliated Company.

Section 3.13 <u>Participant</u> means an Employee who satisfies the requirements under Section 4.1 of the Plan.

Section 3.14 <u>Pay</u> means an Employee's current annual rate of regular base salary or wages on the date of termination of employment with a Member Company and the average of the annual and/or incentive bonuses paid to the Employee over the three years immediately preceding the date of his termination of employment on account of a Change in Control, excluding all other extra pay such as overtime, commissions, premiums, supplements, imputed income and living, auto or other allowances.

Section 3.15 <u>Plan</u> means the Greater Bay Bancorp Change in Control Pay Plan I.

Section 3.16 <u>Plan Year</u> means each twelve (12) consecutive month period from January 1 through December 31.

Section 3.17 <u>Year of Service</u> means a twelve (12)-continuous month period beginning on an Employee's most recent date of hire (or rehire), and each twelve (12)-continuous month period beginning on the anniversary of such hire (or rehire) date, during which the Employee remains continuously employed by a Member Company.

## ARTICLE IV

## ELIGIBILITY FOR BENEFITS

Section 4.1 <u>Employees Eligible for Severance Benefits</u>. Except as provided in this Section 4.1 and in Section 4.2 and subject to Section 5.6, an Employee whose employment is terminated by a Member Company on or after the Effective Date shall be eligible for a Base Benefit if:

(a) Subject to Section 4.2, the Employee's employment is terminated as a result of a Change in Control within two years of the effective time of the Change in Control (the "effective time" of the Change in Control will have the same meaning provided in Section 7.2); and

(b) The Employee's employment is not terminated for cause for personal conduct; and

(c) The Employee executes a waiver and release agreement in such form as determined by the Committee (the "Waiver and Release Agreement") and returns the Waiver and Release Agreement to the Member Company within the time period specified in the Waiver and Release Agreement.

Section 4.2 <u>Employees Not Eligible For Severance Benefits</u>. An Employee shall not

be entitled to a Base Benefit set forth in Article V if:

(a) The Employee has in force an employment contract or executive severance agreement with a Member Company which includes provision for the payment of severance benefits upon the termination of his employment with the Member Company upon a Change in Control, unless such severance benefits are less than the Base Benefit provided for in the Plan; or

(b) The Employee is offered employment by the successor employer in the same position or in another position of comparable pay and status to the position he held immediately prior to the effective date of the Change in Control, or the Employee is offered employment by a Member Company in another position of comparable pay and status to the position held immediately prior to the Change in Control, regardless of whether he accepts the offer; or

(c) The Employee's employment is involuntarily terminated for cause for personal conduct (an Employee whose employment is terminated for cause related to his work performance may be eligible to receive severance benefits under the Plan as the Committee in its sole discretion may determine); or

(d) The Employee fails to perform his regular assigned job duties through the date specified by a Member Company as his termination date; or

(e) The Employee fails to return a properly executed Waiver and Release Agreement on a timely basis.

For purposes of this Section 4.2, a "position of comparable pay and status" shall mean a position with not less than one hundred percent (100%) of the Pay, bonus opportunity and benefits of the position held by the Employee prior to his termination of employment and with a similar scope of duties and responsibilities to such prior position. In addition, a position will not be considered a position of comparable pay and status if (i) an Employee is required to increase his normal commuting miles to reach a new worksite, and (ii) the normal commuting from his home to the new worksite exceeds 35 miles each way. Notwithstanding the foregoing, the Committee reserves the right to make decisions based on the facts and circumstances of individual cases as to whether a position is of comparable pay and status to that held by an Employee prior to his employment termination, provided that the Employee may appeal any such decision pursuant to the provisions of Section 6.5.

## ARTICLE V

## SEVERANCE BENEFITS

Section 5.1 Calculation of Severance Benefit. Subject to the provisions of Section 4.1, 4.2 and 5.6, a Participant whose employment is terminated (or constructively terminated by not being offered a "position of comparable pay and status" as defined in Section 4.2) as a result of a Change in Control, shall be entitled to receive a Base Benefit under this Plan as follows:

(a) Senior Management Council. A Participant who is a member of the Senior Management Council of a Member Company (other than those

members who would receive benefits under the Company's Change in Control Pay Plan II) shall be entitled to receive a Base Benefit equal to eighteen (18) months of Pay.

(b) <u>Senior Vice Presidents and Executive Vice Presidents</u>. A Participant who is a Senior Vice President or Executive Vice President of a Member Company who is not a member of the Senior Management Council shall be entitled to receive a Base Benefit equal to 12 months of Pay.

(c) <u>Vice Presidents and Assistant Vice Presidents</u>. A Participant who is a Vice President or Assistant Vice President of a Member Company shall be entitled to receive a Base Benefit equal to six (6) months of Pay.

(d) <u>Exempt and Non-Exempt Staff</u>. Employees of a Member Company who are either exempt or non-exempt staff shall be entitled to receive a Base Benefit equal to the greater of (i) three (3) months of Pay or (ii) two weeks of Pay for each full Year of Service.

Participants entitled to a Base Benefit shall also receive the following severance benefits: (1) for the length of the applicable severance period, health (or COBRA coverage) and life insurance benefits under the Company's group plans then in effect on terms offered to current employees; (2) outplacement services deemed appropriate by the Committee; and (3) a pro-rated bonus for work performed during the year in which the Change in Control occurs. The pro-rated bonus shall be an amount equal to the average of the annual incentive bonuses for the three-year period immediately preceding the date of termination, pro-rated for the number of months the Participant was employed during the year of termination, subject to the Participant receiving at least a satisfactory performance evaluation.

For purposes of calculating a Participant's severance benefits under Section 5.1(d), the Plan shall take into account only consecutive Years of Service beginning with the Participant's most recent date of hire or rehire and it shall not take into account partial Years of Service, nor shall a Participant receive severance benefits for years of Service for which he previously received severance benefits under the Plan.

Section 5.2 <u>Golden Parachute Restriction</u>.

(a) <u>Reduction for "Parachute Payment."</u> Notwithstanding anything above in this Article V, if a Participant is a "disqualified individual" (as defined in Section 280G(c) of the Code), and the severance benefit provided for in Section 5.1, together with any other payments which the Participant has the right to receive from a Member Company would constitute a "parachute payment" (as defined in Section 280G(b)(2) of the Code), the severance benefit shall be reduced. The reduction shall be in an amount so that the present value of the total amount received by the Participant from a Member Company will be One Dollar ($1.00) less than three (3) times the Participant's base amount (as defined in Section 280G of the Code) and so that no portion of the amounts received by the Participant shall be subject to the excise tax imposed by Section 4999 of the Code.

(b) <u>Deferred Compensation and Reimbursements Exception</u>. In no circumstances will a Member Company reduce the severance benefits payable to a Participant on account of the restrictions of this

Section 5.2 by the amounts the Participant has the right to receive under an executive deferred compensation plan of the Member Company (Deferred Compensation Plan), amounts paid or payable to the Participant to reimburse him either fully or partially for excise tax and/or income tax on the reimbursement (gross up amounts), or amounts paid or payable to the Participant as indemnification for attorney's fees and legal expenses.

(c) Determination of Reduction. The determination as to whether any reduction in the severance benefit is necessary shall be made by a Participant's Member Company in good faith, and the determination shall be conclusive and binding on the Participant.

(d) Repayment of Excess Amount. If through error or otherwise the Participant should receive payments under this Plan, together with other payments the Participant has the right to receive from a Member Company, excluding Deferred Compensation Plan payments in excess of one dollar ($1.00) less than three times his base amount, the Participant shall immediately repay the excess to the Member Company upon notification that an overpayment has been made.

Section 5.3 Payment of Benefits. The Plan shall pay severance benefits to a Participant whose employment is terminated on account of a Change in Control in the form of a lump sum or equal installments payable over a period not to exceed twenty-four (24) months, as the Committee in its sole discretion may determine. The Plan shall make lump sum distributions as soon as administratively practicable and in no event later than thirty (30) days following the receipt by the Company of a timely and properly executed Waiver and Release Agreement. The Plan shall make installment payments in accordance with the Member Company's normal payroll schedule beginning with the first payroll date as soon as administratively practicable following receipt by the Company of a timely and properly executed Waiver and Release Agreement.

Section 5.4 Payment Offset. A Member Company reserves the right to offset the benefits payable under Section 5.1 by any advance, loan or other monies a Participant owes the Member Company. All applicable federal, state and local taxes taxes shall be withheld from all severance payments.

Section 5.5 Unfunded Plan. The obligations of a Member Company under this Plan may be funded through contributions to a trust or otherwise, but the obligations of the Member Company are not required to be funded under this Plan unless required by law. Nothing contained in this Plan shall give a Participant any right, title or interest in any property of the Member Company.

Section 5.6 Prohibition Against Golden Parachute Payments. Notwithstanding any provision of the Plan to the contrary, no Participant who is an institution affiliated party as the term is defined in Section 359.1(h) of the Federal Deposit Insurance Corporation Rules and Regulations") ("FDIC Rules and Regs") shall be entitled to the payment of any severance benefit under the Plan to the extent that such payment shall be deemed a "golden parachute payment" as the term is defined in FDIC Rules and Regs. Section 359.1(f)(i)(ii) or (iii).

ARTICLE VI

ADMINISTRATION

Section 6.1 <u>Plan Administration</u>. The Company shall be the administrator of the Plan for purposes of Section 3(16) of ERISA and shall have responsibility for complying with any ERISA reporting and disclosure rules applicable to the Plan for any Plan Year.

Section 6.2 <u>Plan Committee</u>. In all respects other than as provided in Section 6.1, the Plan shall be administered and operated by the Committee. The Committee shall have all powers necessary to supervise the administration of the Plan and control its operations. In addition to any powers and authority conferred to the Committee elsewhere in the Plan or by law, the Committee shall have, by way of illustration but not by way of limitation, the following discretionary powers and authority:

(a) To allocate fiduciary responsibilities among the named fiduciaries and to designate one or more other persons to carry out fiduciary responsibilities. However, no allocation or delegation under this Section 6.2(a) shall be effective until the person or persons to whom the responsibilities have been allocated or delegated agree to assume the responsibilities;

(b) To designate agents to carry out responsibilities relating to the Plan, other than fiduciary responsibilities;

(c) To employ such legal, accounting, clerical, and other assistance as it may deem appropriate in carrying out the provisions of this Plan, including one or more persons to render advice with regard to any responsibility any fiduciary may have under the Plan;

(d) To establish rules and procedures from time to time for the conduct of the Committee's business and the administration and effectuation of this Plan;

(e) To administer, interpret, construe and apply this Plan. To decide all questions which may arise or which may be raised under this Plan by any Employee, Participant, former Participant or other person whatsoever, including but not limited to all questions relating to eligibility to participate in the Plan, the amount of service of any Participant, and the amount of benefits to which any Participant may be entitled;

(f) To determine the manner in which the severance benefits of this Plan, or any part thereof, shall be administered; and

(g) To perform or cause to be performed such further acts as it may deem to be necessary, appropriate or convenient in the efficient administration of the Plan.

Any action taken in good faith by the Committee in the exercise of discretionary authority conferred upon it by this Plan shall be conclusive and binding upon the Participants. All discretionary powers conferred upon the Committee shall be absolute. However, all discretionary powers shall be exercised in a uniform and nondiscriminatory manner.

Section 6.3 <u>Named Fiduciary</u>. The members of the Committee shall be named fiduciaries with respect to this Plan for purposes of Section 402 of ERISA.

Section 6.4 <u>Indemnification of Committee</u>. The Company shall, to the extent permitted by law, by the purchase of insurance or otherwise, indemnify and hold harmless each member of the Committee and each other fiduciary with respect to this Plan for liabilities or expenses they and each of them incur in carrying out their respective duties under the Plan, other than for any liabilities or expenses arising out of such fiduciary's gross negligence or willful misconduct. A fiduciary shall not be responsible for any breach of responsibility of any other fiduciary except to the extent provided in Section 405 of ERISA.

Section 6.5 <u>Claims Procedure</u>.

(a) <u>Applications for Benefits and Inquiries</u>. Any application for benefits, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Committee in writing by an applicant (or his authorized representative). The address for the Committee is:

Plan Committee

Greater Bay Bancorp

1900 University Avenue, Suite 600

East Palo Alto, CA 94303

(b) <u>Denial of Claims</u>. In the event that any application for benefits is denied in whole or in part, the Committee must provide the applicant with written or electronic notice of the denial of the application, and of the applicant's right to review the denial. Any electronic notice will comply with the regulations of the U.S. Department of Labor. The notice of denial will be set forth in a manner designed to be understood by the applicant and will include the following:

(i) the specific reason or reasons for the denial;

(ii) references to the specific Plan provisions upon which the denial is based;

(iii) a description of any additional information or material that the Committee needs to complete the review and an explanation of why such information or material is necessary; and

(iv) an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the applicant's right to bring a civil action under section 502(a) of ERISA following a denial on review of the claim, as described in Section 6.5(d) below.

This notice of denial will be given to the applicant within ninety (90) days after the Committee receives the application, unless special circumstances require an extension of time, in which case, the Committee has up to an additional ninety (90) days for processing the application. If an extension of time for processing is required, written notice of the extension will be furnished to the applicant before the end of the

initial ninety (90) day period.

This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Committee is to render its decision on the application.

(c) <u>Request for a Review</u>. Any person (or that person's authorized representative) for whom an application for benefits is denied, in whole or in part, may appeal the denial by submitting a request for a review to the Committee within sixty (60) days after the application is denied. A request for a review shall be in writing and shall be addressed to:

Plan Committee

Greater Bay Bancorp

1900 University Avenue, Suite 600

East Palo Alto, CA 94303

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent. The applicant (or his representative) shall have the opportunity to submit (or the Committee may require the applicant to submit) written comments, documents, records, and other information relating to his claim. The applicant (or his representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his claim. The review shall take into account all comments, documents, records and other information submitted by the applicant (or his representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(d) <u>Decision on Review</u>. The Committee will act on each request for review within sixty (60) days after receipt of the request, unless special circumstances require an extension of time (not to exceed an additional sixty (60) days), for processing the request for a review. If an extension for review is required, written notice of the extension will be furnished to the applicant within the initial sixty (60) day period. This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Committee is to render its decision on the review. The Committee will give prompt, written or electronic notice of its decision to the applicant. Any electronic notice will comply with the regulations of the U.S. Department of Labor. In the event that the Committee confirms the denial of the application for benefits in whole or in part, the notice will set forth, in a manner calculated to be understood by the applicant, the following:

(i) the specific reason or reasons for the denial;

(ii) references to the specific Plan provisions upon which the denial is based;

(iii) a statement that the applicant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other

information relevant to his claim (excluding those protected by legal privilege); and

(iv) a statement of the applicant's right to bring a civil action under section 502(a) of ERISA.

(e) <u>Rules and Procedures</u>. The Committee will establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out its responsibilities in reviewing benefit claims. The Committee may require an applicant who wishes to submit additional information in connection with an appeal from the denial of benefits to do so at the applicant's own expense.

(f) <u>Exhaustion of Remedies</u>. No legal action for benefits under the Plan may be brought until the claimant (i) has submitted a written application for benefits in accordance with the procedures described by Section 6.5(a) above, (ii) has been notified by the Committee that the application is denied, (iii) has filed a written request for a review of the application in accordance with the appeal procedure described in Section 6.5(c) above, and (iv) has been notified that the Committee has denied the appeal. Notwithstanding the foregoing, if the Committee does not respond to a Participant's claim or appeal within the relevant time limits specified in this Section 6.5, the Participant may bring legal action for benefits under the Plan pursuant to Section 502(a) of ERISA.

## ARTICLE VII

## AMENDMENT AND TERMINATION

Section 7.1 <u>Before Change in Control</u>. This Plan may be amended from time to time, or terminated at any time at the discretion of the Board of Directors by a written resolution adopted by a majority of the Board of Directors, provided, however, that no amendment or termination shall adversely affect the right of a Participant to receive a severance benefit that the Participant has accrued on account of his termination of employment as a result of a Change in Control.

Section 7.2 <u>After Change in Control</u>. Notwithstanding the foregoing, the Plan may not be amended or participation discontinued after the effective time of a Change in Control. For purposes of this Plan, the "effective time" of a Change in Control shall have the same meaning provided in the agreement governing the transactions which give rise to the Change in Control.

## ARTICLE VIII

## GENERAL

Section 8.1 <u>Payment Out of General Assets</u>. The benefits and costs of this Plan shall be paid by the Company and each Member Company out of their general assets.

Section 8.2 <u>Welfare Benefit Plan</u>. This Plan is intended to be an employee welfare benefit plan, as defined in Section 3(1), Subtitle A of Title 1 of ERISA. The Plan will be interpreted to effectuate this intent.

Section 8.3 <u>Gender</u>. The masculine pronoun shall include the feminine pronoun and the feminine pronoun shall include the masculine pronoun and the singular pronoun

shall include the plural pronoun and the plural pronoun shall include the singular pronoun, unless the context clearly indicates otherwise.

Section 8.4 <u>Limitation on Participant's Rights</u>. Nothing in this Plan shall be construed to guarantee terminated Employees any right to be recalled or rehired by a Member Company.

Section 8.5 <u>Severability</u>. If any provision of this Plan shall be held illegal or invalid, the illegality or invalidity shall not affect the remaining parts, which shall be enforced as if the illegal or invalid provision had not been included in this Plan.

<< Previous Page | Next Page >>

**GREATER BAY**

**BANCORP**

**CHANGE IN CONTROL PAY PLAN I**

<u>(Amended and Restated Effective June 19, 2007)</u>

e: GREATER BAY BANCORP, 8–K, June 25, 2007

EXHIBIT    B

# GREATER BAY BANCORP CHANGE IN CONTROL PAY PLAN I
### Amended and Restated Effective June 19, 2007

## ARTICLE I

### PURPOSE

GREATER BAY BANCORP (the "Company") established, effective as of January 1, 1998, the Change in Control Pay Plan I, as amended and restated effective as of August 21, 2001, and as of January 1, 2005, to provide severance benefits to eligible Employees whose employment terminates in connection with a Change in Control. The Company hereby further amends and restates such plan, effective as of June 19, 2007, in accordance with the terms set forth hereunder. The intent of the plan is to ensure all eligible Employees have reasonable protection related to any event as specified in this plan.

## ARTICLE II

### EFFECTIVE DATE

All of the policies and practices of each Member Company regarding severance, or similar payments upon employment termination on account of a Change in Control are hereby superseded by this plan which shall be known as the GREATER BAY BANCORP Change in Control Pay Plan I (the "Plan"), effective June 19, 2007.

## ARTICLE III

### DEFINITIONS

Section 3.1 Affiliated Company means:

(a)    Any corporation (other than the Company) that is included in a controlled group of corporations, within the meaning of Code Section 414(b), that includes the Company, and

(b)    Any trade or business (other than the Company) that is under common control with the Company within the meaning of Code Section 414(c), and

(c)    Any member (other than the Company) of an affiliated service group, within the meaning of Code Section 414(m), that includes the Company, and

(d)    Any other entity required to be aggregated with the Company pursuant to regulations under Code Section 414(o).

Section 3.2 Base Benefit means the severance benefit payable to a Participant in accordance with Articles IV and V of the Plan, the amount of which is based upon such Participant's Pay and his title or position in a Member Company as of the date he terminates employment with the Member Company on account of a Change in Control.

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

Section 3.3 Board of Directors means the board of directors of the Company.

Case 5:08-cv-01554-JF    Document 30-3    Filed 06/13/2008    Page 3 of 34

Section 3.4 Cause means any of the following:

    (a)    The Employee's violation of any state or federal banking or securities law; or

    (b)    The Employee's violation of the Bylaws, rules, policies or resolutions of the Company; or

    (c)    The Employee's violation of the rules or regulations of the California Department of Financial Institutions, the Federal Deposit Insurance Corporation, the Federal Reserve Board of Governors, the Office of the Comptroller of the Currency or any other regulatory agency or governmental authority having jurisdiction over the Company or any Associated Company; or

    (d)    The Employee's conviction of any felony; or

    (e)    The Employee's commitment of an act involving moral turpitude, fraud, misappropriation, embezzlement or other dishonest conduct; or

    (f)    The Employee's failure to comply with any material terms or conditions of employment as established by the Company, or any applicable employment agreement or any written policies or directives of the Company; or

    (g)    The Employee's failure to properly perform his assigned work duties, which has not been appropriately corrected within 30 days or other established period following written notice from the Company of such failure.

Section 3.5 Change in Control means the first to occur of any of the following events:

    (a)    Any "person" (as that term is used in Section 13 and 14(d)(2) of the Securities Exchange Act of 1934 ("Exchange Act") becomes the beneficial owner (as that term is used in Section 13(d) of the Exchange Act), directly or indirectly, of more than fifty percent (50%) of the Company's capital stock entitled to vote in the election of directors, other than a group of two or more persons not (i) acting in concert for the purpose of acquiring, holding or disposing of such stock or (ii) otherwise required to file any form or report with any governmental agency or regulatory authority having jurisdiction over the Company which requires the reporting of any change in control. The acquisition of additional stock by any person who immediately prior to such acquisition already is the beneficial owner of more than fifty percent (50%) of the capital stock of the Company entitled to vote in the election of directors is not a Change in Control;

3

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

(b)  During any period of not more than twelve (12) consecutive months during which the Company continues in existence, not including any period prior to the adopting of this Plan, individuals who, at the beginning of such period constitute the Board of Directors of the Company, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in clause (a), (c) or (d) of this Section 3.5) whose appointment to the Board of Directors or nomination for election to the Board of Directors was approved by a vote of at least a majority of the directors then still in office, either were directors at the beginning of the period or whose appointment or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof;

(c)  The effective date of any consolidation or merger of the Company (after all requisite shareholder, applicable regulatory and other approvals and consents have been obtained), other than (i) a consolidation or merger of the Company in which the holders of the common stock of the Company immediately prior to the consolidation or merger hold more than fifty percent (50%) of the common stock of the surviving corporation immediately after the consolidation or merger or (ii) a consolidation or merger of the Company with one or more other persons that are related to the Company immediately prior to the consolidation or merger. For purposes of this provision, persons are "related" if one of them owns, directly or indirectly, at least fifty percent (50%) of the voting capital stock of the other or a third person owns, directly or indirectly, at least fifty percent (50%) of the voting capital stock of each of them;

(d)  The sale or transfer of substantially all of the Company's assets to one or more persons that are not related (as defined in clause (c) of this Section 3.5) to the Company immediately prior to the sale or transfer.

Section 3.6 Code means the Internal Revenue Code of 1986, as amended.

Section 3.7 Committee means the Benefits Administration Committee appointed by the Compensation Committee of the Company's Board of Directors or such other person or persons as the Board of Directors or the Compensation Committee of the Board of Directors may designate from time to time.

Section 3.8 Company means GREATER BAY BANCORP.

Section 3.9 Effective Date means June 19, 2007.

Section 3.10 Employee means (1) any full–time employee of a Member Company or (2) any regular part–time employee of a Member Company. For purposes of this Section 3.10, "full–time employee" shall mean an employee of a Member Company who is regularly scheduled to work at least forty (40) hours per week for twelve (12) months each year. Notwithstanding the foregoing, with respect to employees of a Member Company which requires fewer than forty (40) hours per week for classification as a full–time employee, "full–time employee" shall be

4

defined according to such Member Company's administrative policy and practice. "Regular part–time" employee shall mean any employee of a Member Company who is not a temporary or fixed term employee and is regularly scheduled to work at least twenty (20) hours per week for twelve (12) months each year, but fewer hours than necessary to classify him as a full–time employee.

Section 3.11 ERISA means the Employee Retirement Income Security Act of 1974, as amended.

Section 3.12 Member Company means the Company or an Affiliated Company, *provided* that the Compensation Committee of the Company's Board of Directors consents to the participation of any such Affiliated Company in the Plan with respect to eligible Employees of such Affiliated Company.

Section 3.13 Participant means an Employee who satisfies the requirements under Section 4.1 of the Plan.

Section 3.14 Pay means an Employee's current annual rate of regular base salary or wages on the date of termination of employment with a Member Company and the average of the annual cash incentive bonuses (other than any long–term cash incentives and warrant payment plans) paid to (or payable to but deferred by) an Employee over the three–year period immediately preceding the calendar year in which the date of his termination of employment on account of a Change in Control occurs, excluding: (i) overtime or shift pay, (ii) commissions or draws from commission, (iii) incentive plans, programs or policies maintained by ABD Insurance and Financial Services and its Subsidiaries, (iv) signing bonuses or retention pay, (v) warrant income, (vi) premiums, supplements, imputed income, living, auto or other allowances or (vii) any other extra pay. The average of such annual cash incentive bonuses shall be the sum of such annual cash incentive bonuses received by the Employee for each calendar year in the three–year period with respect to which the Employee was eligible to receive an annual cash incentive bonus, divided by the number of calendar years (not exceeding three) that the Employee was eligible to receive such an annual cash incentive bonus. In calculating such average, any partial calendar year of employment commencing on or before September 30 of such year shall be treated as a full calendar year (i.e., both the year and any actual bonus amount for such year shall be included in the calculation of average bonus), and any partial calendar year of employment commencing after September 30 shall be ignored (i.e., both the year and any bonus amount for such year shall be excluded from the calculation of average bonus).

Section 3.15 Plan means the Greater Bay Bancorp Change in Control Pay Plan I.

Section 3.16 Plan Year means each twelve (12) consecutive month period from January 1 through December 31.

Section 3.17 Designated Employee means each of the employees who are specifically identified on Schedule A.

Section 3.18 Year of Service means a twelve (12)–continuous month period beginning on an Employee's most recent date of hire (or rehire), and each twelve (12)–continuous month period beginning on the anniversary of such hire (or rehire) date, during which the Employee remains continuously employed by a Member Company.

5

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

ARTICLE IV

ELIGIBILITY FOR BENEFITS

Section 4.1 Employees Eligible for Severance Benefits. Except as provided in this Section 4.1 and in Sections 4.2 and 4.3 and subject to Section 5.6, an Employee whose employment is terminated by a Member Company or successor employer on or after the effective time of the Change in Control shall be eligible for a Base Benefit if:

(a)    Subject to Sections 4.2 and 4.3, the Employee's employment is terminated as a result of a Change in Control (or constructively terminated by not being provided a Comparable Position (as defined in Section 4.3)) within one (1) year following the effective time of the Change in Control (the "effective time" of the Change in Control will have the same meaning provided in Section 7.2); and

(b)    The Employee's employment is not terminated for Cause; and

(c)    The Employee executes a waiver and release agreement in such form as determined by the Committee (the "Waiver and Release Agreement") and returns the Waiver and Release Agreement to the Member Company within the time period (not to exceed 45 days or such longer period as may be required by applicable law) specified in the Waiver and Release Agreement.

For purposes of this Section 4.1, termination of employment includes termination of a Comparable Position that the Employee has accepted pursuant to an offer described in Section 4.2(b) below.

Section 4.2 Employees Not Eligible For Severance Benefits. An Employee shall not be entitled to a Base Benefit set forth in Article V if:

(a)    The Employee has in force prior to the Effective Date an employment contract or severance agreement with a Member Company that includes provision for the payment of severance benefits upon the termination of employment with the Member Company upon a Change in Control, unless such severance benefits are less than the Base Benefit provided for in the Plan (in which case the Employee shall be entitled to the Base Benefit provided in the Plan in lieu of the severance benefits provided under such agreement); or

(b)    The Employee is provided a Comparable Position (as defined in Section 4.3 below) by the successor employer or by a Member Company, regardless of whether the Employee accepts the offer; or

(c)    The Employee's employment is involuntarily terminated for Cause; or

(d)    The Employee fails to perform his assigned job duties through the date specified by a Member Company as his termination date; or

6

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

(e)     The Employee accepts an offer of employment by a Member Company after the Company's public announcement of the event or events that subsequently constitute the Change in Control; or

(f)     The Employee fails to return a properly executed Waiver and Release Agreement on a timely basis.

Section 4.3 Comparable Position. For purposes of Section 4.2, a "Comparable Position" shall mean a position that meets the following two requirements and such other requirements set forth below as are applicable to the Employee:

(a)     Provides a regular base salary or hourly wage rate that is not less than one hundred percent (100%) of the regular base salary or hourly wage rate of the position held by the Employee immediately prior to the effective time of the Change in Control;

(b)     Is based at a principal place of employment that would not require the Employee to increase his normal one–way commute from his home to the new primary work site by more than thirty–five (35) miles each way;

In addition, for an Employee who is a non–exempt staff member, a new position shall not be considered a Comparable Position if the position entails a material change (reduction or increase) in the number of scheduled work hours per pay period or in scheduled shift worked (but not in scheduled days of the week worked) from those worked by the Employee immediately prior to the effective time of the Change in Control.

An Employee's employment shall be considered terminated by a Member Company as a result of a Change in Control for purposes of Section 4.1 above, without a Comparable Position being provided for purposes of Section 4.2 above, if (i) the Employee's position is changed such that it would no longer be considered a Comparable Position under the criteria set forth above, or (ii) any successor in interest to the Member Company pursuant to the Change in Control fails to assume all obligations of the Member Company under this Plan, or (iii) the Member Company or its successor materially breaches any provision of this Plan pertaining to the Employee or materially breaches any material agreement between the Member Company or its successor and the Employee, in each case which condition continues after written notice from the Employee to the Member Company or its successor given within 90 days of the Change in Control and a reasonable opportunity by the Member Company or its successor to correct any such condition within 30 days following receipt of such notice.

ARTICLE V

SEVERANCE BENEFITS

Section 5.1 Calculation of Severance Benefit. Subject to the provisions of Sections 4.1, 4.2, 4.3 and 5.6, a Participant whose employment is terminated (or constructively terminated by not being offered a Comparable Position as defined in Section 4.3) as a result of a Change in Control, shall be entitled to receive a Base Benefit under this Plan as follows:

(a)     Designated Employees. A Participant who is a Designated Employee shall be entitled to receive a Base Benefit equal to the number of months of Pay set forth on Schedule A.

7

(b)    <u>Senior Vice Presidents and Executive Vice Presidents</u>. A Participant who is a Senior Vice President, Executive Vice President or a Specialty Finance Business Unit President of a Member Company who is not a member of the Senior Management Council and is not a Designated Employee shall be entitled to receive a Base Benefit equal to twelve (12) months of Pay.

(c)    <u>Vice Presidents and Assistant Vice Presidents</u>. A Participant who is a Vice President or Assistant Vice President of a Member Company shall be entitled to receive a Base Benefit equal to six (6) months of Pay.

(d)    <u>Exempt and Non-Exempt Staff</u>. Employees of a Member Company who are either exempt or non-exempt staff shall be entitled to receive a Base Benefit equal to the greater of (i) three (3) months of Pay or (ii) two weeks of Pay for each full Year of Service.

A Participant shall not be entitled to a Base Benefit under more than one of the subsections (a) through (d) above.

Participants entitled to a Base Benefit shall also receive the following severance benefits: (1) for a period equivalent to the number of months (weeks) of Pay on which the Base Benefit is determined, health care benefits (or COBRA coverage) under the Company's group health care plans then in effect on terms offered to current employees, to the extent such coverage is available and timely elected by the Participant under such Company plans, and, if under COBRA coverage, until such earlier time as the Participant has other group healthcare coverage or has declined COBRA coverage; (2) outplacement services deemed appropriate by the Committee; and (3) a pro-rated bonus for work performed during the year in which employment termination occurs under the bonus program applicable to the Participant for such year. Proration of the bonus amount shall be based on the number of months the Participant was employed during the year of termination and the performance level of the Participant, subject to the Participant achieving at least a satisfactory performance evaluation for such year.

For purposes of calculating a Participant's severance benefits under Section 5.1(d), the Plan shall take into account only consecutive Years of Service beginning with the Participant's most recent date of hire or rehire and it shall not take into account partial Years of Service, nor shall a Participant receive severance benefits for years of Service for which he previously received severance benefits under the Plan.

Section 5.2 <u>Golden Parachute Restriction</u>.

(a)    <u>Reduction for "Parachute Payment."</u> Notwithstanding anything above in this Article V, if a Participant is a "disqualified individual" (as defined in Section 280G(c) of the Code), and the severance benefit provided for in Section 5.1, together with any other payments which the Participant has the right to receive from a Member Company would constitute a

8

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

"parachute payment" (as defined in Section 280G(b)(2) of the Code), the severance benefit shall be reduced. The reduction shall be in an amount so that the present value of the total amount received by the Participant from a Member Company will be One Dollar ($1.00) less than three (3) times the Participant's base amount (as defined in Section 280G of the Code) and so that no portion of the amounts received by the Participant shall be subject to the excise tax imposed by Section 4999 of the Code.

(b) <u>Deferred Compensation and Reimbursements Exception</u>. In no circumstances will a Member Company reduce the severance benefits payable to a Participant on account of the restrictions of this Section 5.2 by the amounts the Participant has the right to receive under an executive deferred compensation plan of the Member Company (Deferred Compensation Plan), amounts paid or payable to the Participant under such a Deferred Compensation Plan to reimburse him either fully or partially for excise tax and/or income tax on the reimbursement (gross up amounts), or amounts paid or payable to the Participant as indemnification for attorney's fees and legal expenses.

(c) <u>Determination of Reduction</u>. The determination as to whether any reduction in the severance benefit is necessary shall be made by a Participant's Member Company in good faith, and the determination shall be conclusive and binding on the Participant.

(d) <u>Repayment of Excess Amount</u>. If through error or otherwise the Participant should receive payments under this Plan, together with other payments the Participant has the right to receive from a Member Company, excluding Deferred Compensation Plan payments in excess of One Dollar ($1.00) less than three times his base amount, the Participant shall immediately repay the excess to the Member Company upon notification that an overpayment has been made.

Section 5.3 <u>Payment of Benefits</u>. The Company shall pay severance benefits to a Participant whose employment is terminated on account of a Change in Control in the form of a lump sum. The Company shall make such lump sum payment as soon as administratively practicable and in no event later than thirty (30) days following the receipt by the Company of a timely and properly executed Waiver and Release Agreement. Notwithstanding the foregoing, if any payment hereunder is considered "nonqualified deferred compensation" that is to be made to a Participant who is a "specified employee," in each case as defined and determined for purposes of Code Section 409A, within six months following a Participant's termination of employment, then such payment shall be delayed and paid on the first day of the seventh calendar month following the Participant's termination of employment to the extent that such payment is not otherwise exempt from the application of the 20% excise tax under Code Section 409A.

Section 5.4 <u>Payment Offset</u>. A Member Company reserves the right to offset the benefits payable under Section 5.1 by any advance, loan or other monies a Participant owes the Member Company. All applicable federal, state and local taxes shall be withheld from all severance payments.

9

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

Section 5.5 Unfunded Plan. The obligations of a Member Company under this Plan may be funded through contributions to a trust or otherwise, but the obligations of the Member Company are not required to be funded under this Plan unless required by law. Nothing contained in this Plan shall give a Participant any right, title or interest in any property of the Member Company.

Section 5.6 Prohibition Against Golden Parachute Payments. Notwithstanding any provision of the Plan to the contrary, no Participant who is an institution affiliated party as the term is defined in Section 359.1(h) of the Federal Deposit Insurance Corporation Rules and Regulations ("FDIC Rules and Regs") shall be entitled to the payment of any severance benefit under the Plan to the extent that such payment shall be deemed a "golden parachute payment" as the term is defined in FDIC Rules and Regs. Section 359.1(f)(i)(ii) or (iii).

ARTICLE VI

ADMINISTRATION

Section 6.1 Plan Administration. The Company shall be the administrator of the Plan for purposes of Section 3(16) of ERISA and shall have responsibility for complying with any ERISA reporting and disclosure rules applicable to the Plan for any Plan Year.

Section 6.2 Plan Committee. In all respects other than as provided in Section 6.1, the Plan shall be administered and operated by the Committee. The Committee shall have all powers necessary to supervise the administration of the Plan and control its operations. In addition to any powers and authority conferred to the Committee elsewhere in the Plan or by law, the Committee shall have, by way of illustration but not by way of limitation, the following discretionary powers and authority:

(a)    To allocate fiduciary responsibilities among the named fiduciaries and to designate one or more other persons to carry out fiduciary responsibilities. However, no allocation or delegation under this Section 6.2(a) shall be effective until the person or persons to whom the responsibilities have been allocated or delegated agree to assume the responsibilities;

(b)    To designate agents to carry out responsibilities relating to the Plan, other than fiduciary responsibilities;

(c)    To employ such legal, accounting, clerical, and other assistance as it may deem appropriate in carrying out the provisions of this Plan, including one or more persons to render advice with regard to any responsibility any fiduciary may have under the Plan;

(d)    To establish rules and procedures from time to time for the conduct of the Committee's business and the administration and effectuation of this Plan;

(e)    To administer, interpret, construe and apply this Plan. To decide all questions which may arise or which may be raised under this Plan by any Employee, Participant, former Participant or other person whatsoever, including but not limited to all questions relating to eligibility to participate in the Plan, the amount of service of any Participant, and the amount of benefits to which any Participant may be entitled;

10

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

(f)   To determine the manner in which the severance benefits of this Plan, or any part thereof, shall be administered; and

(g)   To perform or cause to be performed such further acts as it may deem to be necessary, appropriate or convenient in the efficient administration of the Plan.

Any action taken in good faith by the Committee in the exercise of discretionary authority conferred upon it by this Plan shall be conclusive and binding upon the Participants. All discretionary powers conferred upon the Committee shall be absolute. However, all discretionary powers shall be exercised in a uniform and nondiscriminatory manner.

Section 6.3 Named Fiduciary. The members of the Committee shall be named fiduciaries with respect to this Plan for purposes of Section 402 of ERISA.

Section 6.4 Indemnification of Committee. The Company shall, to the extent permitted by law, by the purchase of insurance or otherwise, indemnify and hold harmless each member of the Committee and each other fiduciary with respect to this Plan for liabilities or expenses they and each of them incur in carrying out their respective duties under the Plan, other than for any liabilities or expenses arising out of such fiduciary's gross negligence or willful misconduct. A fiduciary shall not be responsible for any breach of responsibility of any other fiduciary except to the extent provided in Section 405 of ERISA.

Section 6.5 Claims Procedure.

(a)   Applications for Benefits and Inquiries. Any application for benefits, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Committee in writing by an applicant (or his authorized representative). The address for the Committee is:

Plan Committee
c/o Human Resources
Greater Bay Bancorp
1900 University Avenue, Suite 600
East Palo Alto, CA 94303

(b)   Denial of Claims. In the event that any application for benefits is denied in whole or in part, the Committee must provide the applicant with written or electronic notice of the denial of the application, and of the applicant's right to review the denial. Any electronic notice will comply with the regulations of the U.S. Department of Labor. The notice of denial will be set forth in a manner designed to be understood by the applicant and will include the following:

(i)   the specific reason or reasons for the denial;

11

(ii)  references to the specific Plan provisions upon which the denial is based;

(iii)  a description of any additional information or material that the Committee needs to complete the review and an explanation of why such information or material is necessary; and

(iv)  an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the applicant's right to bring a civil action under section 502(a) of ERISA following a denial on review of the claim, as described in Section 6.5(d) below.

This notice of denial will be given to the applicant within ninety (90) days after the Committee receives the application, unless special circumstances require an extension of time, in which case, the Committee has up to an additional ninety (90) days for processing the application. If an extension of time for processing is required, written notice of the extension will be furnished to the applicant before the end of the initial ninety (90) day period.

This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Committee is to render its decision on the application.

(c)  <u>Request for a Review</u>. Any person (or that person's authorized representative) for whom an application for benefits is denied, in whole or in part, may appeal the denial by submitting a request for a review to the Committee within sixty (60) days after the application is denied. A request for a review shall be in writing and shall be addressed to:

Plan Committee
Greater Bay Bancorp
1900 University Avenue, Suite 600
East Palo Alto, CA 94303

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent. The applicant (or his representative) shall have the opportunity to submit (or the Committee may require the applicant to submit) written comments, documents, records, and other information relating to his claim. The applicant (or his representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his claim. The review shall take into account all comments, documents, records and other information submitted by the applicant (or his representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(d)  <u>Decision on Review</u>. The Committee will act on each request for review within sixty (60) days after receipt of the request, unless special circumstances require an extension of time (not to exceed an additional sixty (60) days), for processing the request for a review. If an extension

12

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

for review is required, written notice of the extension will be furnished to the applicant within the initial sixty (60) day period. This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Committee is to render its decision on the review. The Committee will give prompt, written or electronic notice of its decision to the applicant. Any electronic notice will comply with the regulations of the U.S. Department of Labor. In the event that the Committee confirms the denial of the application for benefits in whole or in part, the notice will set forth, in a manner calculated to be understood by the applicant, the following:

(i)     the specific reason or reasons for the denial;

(ii)    references to the specific Plan provisions upon which the denial is based;

(iii)   a statement that the applicant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his claim (excluding those protected by legal privilege); and

(iv)    a statement of the applicant's right to bring a civil action under section 502(a) of ERISA.

(e)    <u>Rules and Procedures</u>. The Committee will establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out its responsibilities in reviewing benefit claims. The Committee may require an applicant who wishes to submit additional information in connection with an appeal from the denial of benefits to do so at the applicant's own expense.

(f)    <u>Exhaustion of Remedies</u>. No legal action for benefits under the Plan may be brought until the claimant (i) has submitted a written application for benefits in accordance with the procedures described by Section 6.5(a) above, (ii) has been notified by the Committee that the application is denied, (iii) has filed a written request for a review of the application in accordance with the appeal procedure described in Section 6.5(c) above, and (iv) has been notified that the Committee has denied the appeal. Notwithstanding the foregoing, if the Committee does not respond to a Participant's claim or appeal within the relevant time limits specified in this Section 6.5, the Participant may bring legal action for benefits under the Plan pursuant to Section 502(a) of ERISA.

13

ARTICLE VII

AMENDMENT AND TERMINATION

Section 7.1 Before Change in Control. This Plan may be amended from time to time, or terminated at any time at the discretion of the Board of Directors by a written resolution adopted by a majority of the Board of Directors, *provided*, *however*, that no amendment or termination shall adversely affect the right of a Participant to receive a severance benefit that the Participant has accrued on account of his termination of employment as a result of a Change in Control.

Section 7.2 After Change in Control. Notwithstanding the foregoing, the Plan may not be amended or participation discontinued after the effective time of a Change in Control. For purposes of this Plan, the "effective time" of a Change in Control shall have the same meaning provided in the agreement governing the transactions which give rise to the Change in Control.

ARTICLE VIII

GENERAL

Section 8.1 Payment Out of General Assets. The benefits and costs of this Plan shall be paid by the Company and each Member Company out of their general assets.

Section 8.2 Welfare Benefit Plan. This Plan is intended to be an employee welfare benefit plan, as defined in Section 3(1), Subtitle A of Title 1 of ERISA. The Plan will be interpreted to effectuate this intent.

Section 8.3 Gender. The masculine pronoun shall include the feminine pronoun and the feminine pronoun shall include the masculine pronoun and the singular pronoun shall include the plural pronoun and the plural pronoun shall include the singular pronoun, unless the context clearly indicates otherwise.

Section 8.4 Limitation on Participant's Rights. Nothing in this Plan shall be construed to guarantee terminated Employees any right to be recalled or rehired by a Member Company.

Section 8.5 Severability. If any provision of this Plan shall be held illegal or invalid, the illegality or invalidity shall not affect the remaining parts, which shall be enforced as if the illegal or invalid provision had not been included in this Plan.

14

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

Schedule A

[INTENTIONALLY OMITTED]

15

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

Exhibit 10.2

**GREATER BAY**

**BANCORP**

**CHANGE IN CONTROL PAY PLAN II**

<u>(Amended and Restated Effective June 19, 2007)</u>

Source: GREATER BAY BANCORP, 8–K, June 25, 2007

GREATER BAY BANCORP
CHANGE IN CONTROL PAY PLAN II
Amended and Restated Effective June 19, 2007

## ARTICLE I

## PURPOSE

GREATER BAY BANCORP (the "Company") established, effective as of January 1, 1998, as amended and restated effective as of August 21, 2001, and as of January 1, 2005, a change in control pay plan to provide severance benefits to selected executives who are deemed Eligible Employees and whose employment terminates in connection with a Change in Control. The Company hereby further amends and restates such Plan, effective as of June 19, 2007, in accordance with the terms set forth hereunder. The intent of the plan is to ensure all Eligible Employees (as the term is defined herein) have reasonable protection related to any event as specified in this Plan.

## ARTICLE II

## EFFECTIVE DATE

All of the policies and practices of each Member Company regarding severance, or similar payments to Eligible Employees upon their employment termination on account of a Change in Control are hereby superseded by this plan which shall be known as the GREATER BAY BANCORP Change in Control Pay Plan II (the "Plan"), effective June 19, 2007.

## ARTICLE III

## DEFINITIONS

Section 3.1 Affiliated Company means:

(a)    Any corporation (other than the Company) that is included in a controlled group of corporations, within the meaning of Code Section 414(b), that includes the Company; and

(b)    Any trade or business (other than the Company) that is under common control with the Company within the meaning of Code Section 414(c); and

(c)    Any member (other than the Company) of an affiliated service group, within the meaning of Code Section 414(m), that includes the Company; and

(d)    Any other entity required to be aggregated with the Company pursuant to regulations under Code Section 414(o).

Section 3.2 Base Benefit means the severance benefit payable to a Participant in accordance with Articles IV and V of the Plan, the amount of which is based upon such Participant's Pay and his title or position as of the date he terminates employment with a Member Company on account of a Change in Control.

2

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

Section 3.3 <u>Board of Directors</u> means the board of directors of the Company.

Section 3.4 <u>Cause</u> means any of the following:

(a)  The Employee's violation of any state or federal banking or securities law; or

(b)  The Employee's violation of the Bylaws, rules, policies or resolutions of the Company; or

(c)  The Employee's violation of the rules or regulations of the California Department of Financial Institutions, the Federal Deposit Insurance Corporation, the Federal Reserve Board of Governors, the Office of the Comptroller of the Currency or any other regulatory agency or governmental authority having jurisdiction over the Company or any Associated Company; or

(d)  The Employee's conviction of any felony; or

(e)  The Employee's commitment of an act involving moral turpitude, fraud, misappropriation, embezzlement or other dishonest conduct; or

(f)  The Employee's failure to comply with any material terms or conditions of employment as established by the Company, or any applicable employment agreement or any written policies or directives of the Company, other than inadvertent and insubstantial failures that have been corrected within 30 days after written notice from the Company of such failure; or

(g)  The Employee's failure to properly perform his assigned work duties, which failure has not been appropriately corrected within 30 days or other established period following written notice from the Company of such failure.

Section 3.5 <u>Change in Control</u> means the first to occur of any of the following events:

(a)  Any "person" (as that term is used in Section 13 and 14(d)(2) of the Securities Exchange Act of 1934 ("Exchange Act") becomes the beneficial owner (as that term is used in Section 13(d) of the Exchange Act), directly or indirectly, of more than fifty percent (50%) of the Company's capital stock entitled to vote in the election of directors, other than a group of two or more persons not (i) acting in concert for the purpose of acquiring, holding or disposing of such stock or (ii) otherwise required to file any form or report with any governmental agency or

3

regulatory authority having jurisdiction over the Company which requires the reporting of any change in control. The acquisition of additional stock by any person who immediately prior to such acquisition already is the beneficial owner of more than fifty percent (50%) of the capital stock of the Company entitled to vote in the election of directors is not a Change in Control;

(b)    During any period of not more than twelve (12) consecutive months during which the Company continues in existence, not including any period prior to the adopting of this Plan, individuals who, at the beginning of such period constitute the Board of Directors of the Company, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in clause (a), (c) or (d) of this Section 3.5) whose appointment to the Board of Directors or nomination for election to the Board of Directors was approved by a vote of at least a majority of the directors then still in office, either were directors at the beginning of the period or whose appointment or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof;

(c)    The effective date of any consolidation or merger of the Company (after all requisite shareholder, applicable regulatory and other approvals and consents have been obtained), other than (i) a consolidation or merger of the Company in which the holders of the common stock of the Company immediately prior to the consolidation or merger hold more than fifty percent (50%) of the common stock of the surviving corporation immediately after the consolidation or merger or (ii) a consolidation or merger of the Company with one or more other persons that are related to the Company immediately prior to the consolidation or merger. For purposes of this provision, persons are "related" if one of them owns, directly or indirectly, at least fifty percent (50%) of the voting capital stock of the other or a third person owns, directly or indirectly, at least fifty percent (50%) of the voting capital stock of each of them;

(d)    The sale or transfer of substantially all of the Company's assets to one or more persons that are not related (as defined in clause (c) of this Section 3.5) to the Company immediately prior to the sale or transfer.

Section 3.6 Code means the Internal Revenue Code of 1986, as amended.

Section 3.7 Committee means the Benefits Administration Committee appointed by the Compensation Committee of the Company's Board of Directors or such other person or persons as the Board of Directors or the Compensation Committee of the Board of Directors may designate from time to time.

Section 3.8 Company means GREATER BAY BANCORP.

4

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

Section 3.9 <u>Effective Date</u> means June 19, 2007.

Section 3.10 <u>Employee</u> means (1) any full–time employee of a Member Company or (2) any regular part–time employee of a Member Company. For purposes of this Section 3.10, "full–time employee" shall mean an employee of a Member Company who is regularly scheduled to work at least forty (40) hours per week for twelve (12) months each year. Notwithstanding the foregoing, with respect to employees of a Member Company which requires fewer than forty (40) hours per week for classification as a full–time employee, "full–time employee" shall be defined according to such Member Company's administrative policy and practice. "Regular part–time" employee shall mean any employee of a Member Company who is not a temporary or fixed term employee and is regularly scheduled to work at least twenty (20) hours per week for twelve (12) months each year, but fewer hours than necessary to classify him as a full–time employee.

Section 3.11 <u>Eligible Employee</u> means an Employee who is a key executive of a Member Company and who is eligible to participate in the Plan. The only Employees who are deemed "Eligible Employees" for purposes of the Plan are those Employees who are members of the Company's Managing Committee or members of the Company's Senior Management Council and who are listed on Exhibit A hereto.

Section 3.12 <u>ERISA</u> means the Employee Retirement Income Security Act of 1974, as amended.

Section 3.13 <u>Member Company</u> means the Company or an Affiliated Company, provided that the Compensation Committee of the Company's Board of Directors consents to the participation of any such Affiliated Company in the Plan with respect to Eligible Employees of such Affiliated Company.

Section 3.14 <u>Participant</u> means an Employee who satisfies the requirements under Section 4.1 of the Plan.

Section 3.15 <u>Pay</u> means an Eligible Employee's current annual rate of regular base salary or wages on the date of termination of employment with a Member Company and the average of the annual cash incentive bonuses (other than any long–term cash incentives and warrant payment plans) paid to (or payable to but deferred by) an Eligible Employee over the three–year period immediately preceding the calendar year in which the date of his termination of employment on account of a Change in Control occurs, excluding: (i) overtime or shift pay, (ii) commissions or draws from commission, (iii) incentive plans, programs or policies maintained by ABD Insurance and Financial Services and its Subsidiaries, (iv) signing bonuses or retention pay, (v) warrant income, (vi) premiums, supplements, imputed income, living, auto or other allowances or (vii) any other extra pay. The average of such annual cash incentive bonuses shall be the sum of such annual cash incentive bonuses received by the Eligible Employee for each calendar year in the three–year period with respect to which the Eligible Employee was eligible to receive an annual cash incentive bonus, divided by the number of calendar years (not exceeding three) that the Eligible Employee was eligible to receive such an annual cash incentive bonus. In calculating such average, any partial calendar year of employment commencing on or before September 30 of such year shall be treated as a full calendar year (i.e., both the year and

5

Source: GREATER BAY BANCORP, 8–K, June 25, 2007

any actual bonus amount for such year shall be included in the calculation of average bonus), and any partial calendar year of employment commencing after September 30 shall be ignored (i.e., both the year and any bonus amount for such year shall be excluded from the calculation of average bonus).

Section 3.16 <u>Plan</u> means the Greater Bay Bancorp Change in Control Pay Plan II.

Section 3.17 <u>Plan Year</u> means each twelve (12) consecutive month period from January 1 through December 31.

ARTICLE IV

ELIGIBILITY FOR BENEFITS

Section 4.1 <u>Employees Eligible for Severance Benefits</u>. Except as provided in this Section 4.1 and in Sections 4.2 and 4.3 and subject to Section 5.6, an Eligible Employee whose employment is terminated by a Member Company on or after the Effective Date shall be eligible for a Base Benefit if:

(a)    Subject to Section 4.2, the Eligible Employee's employment is terminated as a result of a Change in Control (or constructively terminated by not being provided a Comparable Position (as defined in Section 4.3)) within one (1) year following the effective time of the Change in Control (the "effective time" of the Change in Control will have the same meaning provided in Section 7.2); and

(b)    The Eligible Employee's employment is not terminated for Cause; and

(c)    The Employee executes a waiver and release agreement in such form as determined by the Committee (the "Waiver and Release Agreement") and returns the Waiver and Release Agreement to the Member Company within the time period (not to exceed 45 days or such longer period as may be required by applicable law) specified in the Waiver and Release Agreement.

Section 4.2 <u>Employees Not Eligible For Severance Benefits</u>. An Eligible Employee shall not be entitled to a Base Benefit set forth in Article V if:

(a)    The Employee has in force prior to the Effective Date an employment contract or executive severance agreement with a Member Company that includes provision for the payment of severance benefits upon the termination of his employment with the Member Company upon a Change in Control, unless such severance benefits are less than the Base Benefit provided for in the Plan (in which case the Employee shall be entitled to the Base Benefit provided in the Plan in lieu of the severance benefits provided under such agreement); or

6

Source: GREATER BAY BANCORP, 8–K, June 25, 2007

(b)    The Eligible Employee is provided a Comparable Position (as defined in Section 4.3 below) by the successor employer or by a Member Company, regardless of whether the Eligible Employee accepts the offer; or

(c)    The Eligible Employee's employment is involuntarily terminated for Cause; or

(d)    The Eligible Employee fails to perform his assigned job duties through the date specified by a Member Company as his termination date; or

(e)    The Eligible Employee accepts an offer of employment with a Member Company after the Company's public announcement of the event or events that subsequently constitute the Change in Control; or

(f)    The Eligible Employee fails to return a properly executed Waiver and Release Agreement on a timely basis.

Section 4.3 Comparable Position. For purposes of Section 4.2, a "Comparable Position" shall mean a position that meets each of the following requirements:

(a)    Provides a regular base salary that is not less than one hundred percent (100%) of the regular base salary of the position held by the Eligible Employee immediately prior to the effective time of the Change in Control;

(b)    Is based at a principal place of employment that would not require the Eligible Employee to increase his normal one-way commute from his home to the new primary work site by more than thirty-five (35) miles each way;

(c)    Entails overall duties and responsibilities that are not a substantial diminution of the Eligible Employee's duties and responsibilities immediately prior to the effective time of the Change in Control.

If an Eligible Employee is offered a position of limited duration, not to exceed one year following the effective time of the Change in Control, which position meets requirements (a) and (b) above but not the requirements of (c) above, then the Eligible Employee shall be entitled to a Base Benefit set forth in Article V only if the Eligible Employee continues in employment for the required period of limited duration (without regard to the fact that the termination does not occur prior to the first anniversary of the Change in Control). In this latter event, "Pay" shall be the greater of what such "Pay" would be calculated as of termination of the Eligible Employee's original position and termination of the position of limited duration.

An Eligible Employee's employment shall be considered terminated by a Member Company as a result of a Change in Control for purposes of Section 4.1 above, without a Comparable Position being provided for purposes of Section 4.2 above, if (i) the Eligible Employee's position is changed such that it would no longer be considered a Comparable Position under the criteria set forth above, or (ii) any successor in interest to the Member

7.

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

Company pursuant to the Change in Control fails to assume all obligations of the Member Company under this Plan, or (iii) the Member Company or its successor materially breaches any provision of this Plan pertaining to the Eligible Employee or materially breaches any material agreement between the Member Company or its successor and the Eligible Employee, in each case which condition continues after written notice from the Eligible Employee to the Member Company or its successor given within 90 days of the Change in Control and a reasonable opportunity by the Member Company or its successor to correct any such condition within 30 days following receipt of such notice.

ARTICLE V

SEVERANCE BENEFITS

Section 5.1 Calculation of Severance Benefit. Subject to the provisions of Sections 4.1, 4.2, 4.3 and 5.6, a Participant whose employment is terminated (or constructively terminated by not being offered a Comparable Position (as defined in Section 4.3)) as a result of a Change in Control, shall be entitled to receive a Base Benefit under this Plan as follows:

(a)   Managing Committee. A Participant who is a member of the Company's Managing Committee shall be entitled to receive a Base Benefit equal to thirty (30) months of Pay.

(b)   Senior Management Council. A Participant who is a member of the Senior Management Council of a Member Company (other than those members who are also members of the Managing Committee) shall be entitled to receive a Base Benefit equal to eighteen (18) months of Pay.

Participants entitled to a Base Benefit shall also receive the following severance benefits: (1) for a period equivalent to the number of months of Pay on which the Base Benefit is determined, health care benefits (or COBRA coverage) under the Company's group healthcare plans then in effect on terms offered to current employees, to the extent such coverage is available and timely elected by the Participant under such Company plans, and, if under COBRA coverage, until such earlier time as the Participant has other group healthcare coverage or has declined COBRA coverage; (2) outplacement services deemed appropriate by the Committee; and (3) a pro-rated bonus for work performed during the year in which employment termination occurs under the bonus program applicable to the Participant for such year. Proration of the bonus amount shall be based on the number of months the Participant was employed during the year of termination and the performance level of the Participant, subject to the Participant receiving at least a satisfactory performance evaluation for such year.

Section 5.2 Indemnity.

(a)   Except as provided in Section 5.2(e) below, in the event it shall be determined that any payment by the Company to or for the benefit of a Participant pursuant to the terms of this Plan (a "Payment") would subject a Participant to the excise tax imposed by Section 4999 of the Code, or any interest or penalties are incurred by a Participant with respect to such

8

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

excise tax (such excise tax, together with any such interest and penalties, are hereinafter collectively referred to as the "Excise Tax"), then such Participant shall be entitled to receive an additional payment (a "Gross-Up Payment") in an amount such that after payment by such Participant of all taxes (including any interest or penalties imposed with respect to such taxes), including, without limitation, any income taxes (and any interest and penalties imposed with respect thereto) and Excise Tax imposed upon the Gross-Up Payment, such Participant retains an amount of the Gross-Up Payment equal to the Excise Tax imposed upon the payments.

(b)    Subject to the provisions of the next paragraph, all determinations required to be made under this Plan, including whether and when a Gross-Up Payment is required and the amount of such Gross-Up Payment and the assumptions to be utilized in arriving at such determination, shall be made by a certified public accounting firm designated by the Committee (the "Accounting Firm") which shall provide detailed supporting calculations both to the Company and the Participant within 15 business days of the receipt of notice from the Participant that there has been a Payment, or such earlier time as is requested by the Company. All fees and expenses of the Accounting Firm shall be borne solely by the Company. Any Gross-Up Payment, as determined pursuant to this Plan, shall be paid by the Company to the Participant within five days of the later of (i) the due date for the payment of any Excise Tax, and (ii) the receipt of the Accounting Firm's determination. Any determination by the Accounting Firm shall be binding upon the Company and the Participant. As a result of the uncertainty in the application of Section 4999 of the Code at the time of the initial determination by the Accounting Firm hereunder, it is possible that Gross-Up Payments which will not have been made by the Company should have been made ("Underpayment"), consistent with the calculations required to be made hereunder. In the event that the Company exhausts its remedies pursuant to the next paragraph and the Participant thereafter is required to make a payment of any Excise Tax, the Accounting Firm shall determine the amount of the Underpayment that has occurred and any such Underpayment shall be promptly paid by the Company to or for the benefit of the Participant.

(c)    As a condition to indemnification hereunder, each Participant must notify the Company in writing of any claim by the Internal Revenue Service that, if successful, would require the payment by the Company of the Gross-Up Payment and comply with the rules in this paragraph (c) and in paragraph (d). Such notification shall be given as soon as practicable but not later than ten business days after the Participant is informed in writing of such claim and shall apprise the Company of the nature of such claim and the date on which such claim is requested to be paid. The Participant shall not pay such claim prior to the expiration of the 30-day period following the date on which the Participant gives such notice to the Company (or such shorter period ending on the date that any payment of taxes with respect to

9

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

such claim is due). If the Company notifies the Participant in writing prior to the expiration of such period that it desires to contest such claim, the Participant must: (i) give the Company any information reasonably requested by the Company relating to such claim, (ii) take such action in connection with contesting such claim as the Company shall reasonably request in writing from time to time, including, without limitation, accepting representation with respect to such claim by an attorney or accountant reasonably selected by the Company, (iii) cooperate with the Company in good faith in order effectively to contest such claim, and (iv) permit the Company to participate in any proceedings relating to such claim; *provided, however,* that the Company shall bear and pay directly all costs and expenses (including additional interest and penalties) incurred in connection with such contest and shall indemnify and hold the Participant harmless, on an after–tax basis, for any Excise Tax or income tax (including interest and penalties with respect thereto) imposed as a result of such representation and payment of costs and expenses. Without limitation on the foregoing provisions of this paragraph, the Company shall control all proceedings taken in connection with such contest and, at its sole option, may pursue or forego any and all administrative appeals, proceedings, hearings and conferences with the taxing authority in respect of such claim and may, at its sole option, either direct the Participant to pay the tax claimed and sue for a refund or contest the claim in any permissible manner, and the Participant must prosecute such contest to a determination before any administrative tribunal, in a court of initial jurisdiction and in one or more appellate courts, as the Company shall determine; *provided, however,* that if the Company directs the Participant to pay such claim and sue for a refund, the Company shall advance the amount of such payment to the Participant, on an interest–free basis, and shall indemnify and hold the Participant harmless, on an after–tax basis, from any Excise Tax or income tax (including interest or penalties with respect thereto) imposed with respect to such advance or with respect to any imputed income with respect to such advance; and *provided, further,* that any extension of the statute of limitations relating to payment of taxes for the taxable year of the Participant with respect to which such contested amount is claimed to be due is limited solely to such contested amount. Furthermore, the Company's control of the contest shall be limited to issues with respect to which a Gross–Up Payment would be payable hereunder and the Participant shall be entitled to settle or contest, as the case may be, any other issue raised by the IRS or any other taxing authority.

(d)    If, after the receipt by the Participant of an amount advanced by the Company pursuant to this letter agreement, the Participant becomes entitled to receive any refund with respect to such claim, the Participant must (subject to the Company's complying with the requirements of the preceding paragraph) promptly pay to the Company the amount of such refund (together with any interest paid or credited thereon after taxes

10

Source: GREATER BAY BANCORP, 8–K, June 25, 2007

applicable thereto). If, after the receipt by the Participant of an amount advanced by the Company pursuant to the preceding paragraph, a determination is made that the Participant shall not be entitled to any refund with respect to such claim and the Company does not notify the Participant in writing of its intent to contest such denial or refund prior to the expiration of 30 days after such determination, then such advance shall be forgiven and shall not be required to be repaid and the amount of such advance shall offset, to the extent thereof, the amount of Gross–Up Payment required to be paid.

(e)    Participants who are members of the Company's Senior Management Council of a Member Company shall not be entitled to the foregoing benefits of this Section 5.2 and instead shall be subject to the provisions set forth on Exhibit B.

Section 5.3 Payment of Benefits. The Company shall pay severance benefits to a Participant whose employment is terminated on account of a Change in Control in the form of a lump sum. The Company shall make such lump sum payment as soon as administratively practicable and in no event later than thirty (30) days following the receipt by the Company of a timely and properly executed Waiver and Release Agreement. Notwithstanding the foregoing, if any payment hereunder is considered "nonqualified deferred compensation" that is to be made to a Participant who is a "specified employee," in each case as defined and determined for purposes of Code Section 409A, within six months following a Participant's termination of employment, then such payment shall be delayed and paid on the first day of the seventh calendar month following the Participant's termination of employment to the extent that such payment is not otherwise exempt from the application of the 20% excise tax under Code Section 409A. Notwithstanding the foregoing, if any payment is to be made in calendar year 2007, and if any portion of such payment that is considered "nonqualified deferred compensation" as defined and determined for purposes of Code Section 409A would have been paid after the end of calendar year 2007 under the payment schedule provided in the Plan prior to its amendment and restatement effective June 19, 2007, then such portion of such payment shall be delayed and paid on the first business day of calendar year 2008.

Section 5.4 Payment Offset. A Member Company reserves the right to offset the benefits payable under Section 5.1 by any advance, loan or other monies a Participant owes the Member Company. All applicable federal, state and local taxes shall be withheld from all severance payments.

Section 5.5 Unfunded Plan. The obligations of a Member Company under this Plan may be funded through contributions to a trust or otherwise, but the obligations of the Member Company are not required to be funded under this Plan unless required by law. Nothing contained in this Plan shall give a Participant any right, title or interest in any property of the Member Company.

Section 5.6 Prohibition against Certain Payments. Notwithstanding any provision of the Plan to the contrary, no Participant shall be entitled to receive, and a Member Company shall not pay, any amount under this Plan that is prohibited by Section 359.1(h) of the Federal Deposit Insurance Corporation Rules and Regulations.

11

Source: GREATER BAY BANCORP, 8–K, June 25, 2007

# ARTICLE VI

## ADMINISTRATION

**Section 6.1 Plan Administration.** The Company shall be the administrator of the Plan for purposes of Section 3(16) of ERISA and shall have responsibility for complying with any ERISA reporting and disclosure rules applicable to the Plan for any Plan Year.

**Section 6.2 Plan Committee.** In all respects other than as provided in Section 6.1, the Plan shall be administered and operated by the Committee. The Committee shall have all powers necessary to supervise the administration of the Plan and control its operations. In addition to any powers and authority conferred to the Committee elsewhere in the Plan or by law, the Committee shall have, by way of illustration but not by way of limitation, the following discretionary powers and authority:

(a)  To allocate fiduciary responsibilities among the named fiduciaries and to designate one or more other persons to carry out fiduciary responsibilities. However, no allocation or delegation under this Section 6.2(a) shall be effective until the person or persons to whom the responsibilities have been allocated or delegated agree to assume the responsibilities;

(b)  To designate agents to carry out responsibilities relating to the Plan, other than fiduciary responsibilities;

(c)  To employ such legal, accounting, clerical, and other assistance as it may deem appropriate in carrying out the provisions of this Plan, including one or more persons to render advice with regard to any responsibility any fiduciary may have under the Plan;

(d)  To establish rules and procedures from time to time for the conduct of the Committee's business and the administration and effectuation of this Plan;

(e)  To administer, interpret, construe and apply this Plan. To decide all questions which may arise or which may be raised under this Plan by any Employee, Participant, former Participant or other person whatsoever, including but not limited to all questions relating to eligibility to participate in the Plan, the amount of service of any Participant and the amount of benefits to which any Participant may be entitled;

(f)  To determine the manner in which the severance benefits of this Plan, or any part thereof, shall be administered; and

(g)  To perform or cause to be performed such further acts as it may deem to be necessary, appropriate or convenient in the efficient administration of the Plan.

12

Any action taken in good faith by the Committee in the exercise of discretionary authority conferred upon it by this Plan shall be conclusive and binding upon the Participants. All discretionary powers conferred upon the Committee shall be absolute. However, all discretionary powers shall be exercised in a uniform and nondiscriminatory manner.

Section 6.3 Named Fiduciary. The members of the Committee shall be named fiduciaries with respect to this Plan for purposes of Section 402 of ERISA.

Section 6.4 Indemnification of Committee. The Company shall, to the extent permitted by law, by the purchase of insurance or otherwise, indemnify and hold harmless each member of the Committee and each other fiduciary with respect to this Plan for liabilities or expenses they and each of them incur in carrying out their respective duties under the Plan, other than for any liabilities or expenses arising out of such fiduciary's gross negligence or willful misconduct. A fiduciary shall not be responsible for any breach of responsibility of any other fiduciary except to the extent provided in Section 405 of ERISA.

Section 6.5 Claims Procedure.

(a)    Applications for Benefits and Inquiries. Any application for benefits, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Committee in writing by an applicant (or his authorized representative). The address for the Committee is:

> Plan Committee
> c/o Human Resources
> Greater Bay Bancorp
> 1900 University Avenue, Suite 600
> East Palo Alto, CA 94303

(b)    Denial of Claims. In the event that any application for benefits is denied in whole or in part, the Committee must provide the applicant with written or electronic notice of the denial of the application, and of the applicant's right to review the denial. Any electronic notice will comply with the regulations of the U.S. Department of Labor. The notice of denial will be set forth in a manner designed to be understood by the applicant and will include the following:

(i)    the specific reason or reasons for the denial;

(ii)    references to the specific Plan provisions upon which the denial is based;

(iii)    a description of any additional information or material that the Committee needs to complete the review and an explanation of why such information or material is necessary; and

(iv)    an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the

13

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

applicant's right to bring a civil action under section 502(a) of ERISA following a denial on review of the claim, as described in Section 6.5(d) below.

This notice of denial will be given to the applicant within ninety (90) days after the Committee receives the application, unless special circumstances require an extension of time, in which case, the Committee has up to an additional ninety (90) days for processing the application. If an extension of time for processing is required, written notice of the extension will be furnished to the applicant before the end of the initial ninety (90) day period.

This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Committee is to render its decision on the application.

(c)    Request for a Review. Any person (or that person's authorized representative) for whom an application for benefits is denied, in whole or in part, may appeal the denial by submitting a request for a review to the Committee within sixty (60) days after the application is denied. A request for a review shall be in writing and shall be addressed to:

Plan Committee
Greater Bay Bancorp
1900 University Avenue, Suite 600
East Palo Alto, CA 94303

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent. The applicant (or his representative) shall have the opportunity to submit (or the Committee may require the applicant to submit) written comments, documents, records, and other information relating to his claim. The applicant (or his representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his claim. The review shall take into account all comments, documents, records and other information submitted by the applicant (or his representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(d)    Decision on Review. The Committee will act on each request for review within sixty (60) days after receipt of the request, unless special circumstances require an extension of time (not to exceed an additional sixty (60) days), for processing the request for a review. If an extension for review is required, written notice of the extension will be furnished to the applicant within the initial sixty (60) day period. This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Committee is to render its decision on the review. The Committee will give prompt, written or electronic notice of its decision to the applicant. Any electronic notice will comply with the regulations of the U.S. Department of Labor. In the event that the Committee confirms the denial of the application for benefits in whole or in part, the notice will set forth, in a manner calculated to be understood by the applicant, the following:

(i)    the specific reason or reasons for the denial;

14

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

(ii)    references to the specific Plan provisions upon which the denial is based;

(iii)    a statement that the applicant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his claim (excluding those protected by legal privilege); and

(iv)    a statement of the applicant's right to bring a civil action under section 502(a) of ERISA.

(e)    <u>Rules and Procedures</u>. The Committee will establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out its responsibilities in reviewing benefit claims. The Committee may require an applicant who wishes to submit additional information in connection with an appeal from the denial of benefits to do so at the applicant's own expense.

(f)    <u>Exhaustion of Remedies</u>. No legal action for benefits under the Plan may be brought until the claimant (i) has submitted a written application for benefits in accordance with the procedures described by Section 6.5(a) above, (ii) has been notified by the Committee that the application is denied, (iii) has filed a written request for a review of the application in accordance with the appeal procedure described in Section 6.5(c) above, and (iv) has been notified that the Committee has denied the appeal. Notwithstanding the foregoing, if the Committee does not respond to a Participant's claim or appeal within the relevant time limits specified in this Section 6.5, the Participant may bring legal action for benefits under the Plan pursuant to Section 502(a) of ERISA.

## ARTICLE VII

### AMENDMENT AND TERMINATION

Section 7.1 <u>Before Change in Control</u>. This Plan may be amended from time to time, or terminated at any time at the discretion of the Board of Directors by a written resolution adopted by a majority of the Board of Directors, *provided, however,* that no amendment or termination shall adversely affect the right of a Participant to receive a severance benefit that the Participant has accrued on account of his termination of employment as a result of a Change in Control.

Section 7.2 <u>After Change in Control</u>. Notwithstanding the foregoing, the Plan may not be amended or participation discontinued after the effective time of a Change in

15

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

Control. For purposes of this Plan, the "effective time" of a Change in Control shall have the same meaning provided in the agreement governing the transactions which give rise to the Change in Control.

## ARTICLE VIII

### GENERAL

Section 8.1 <u>Payment Out of General Assets</u>. The benefits and costs of this Plan shall be paid by a Member Company out of its general assets.

Section 8.2 <u>Welfare Benefit Plan</u>. This Plan is intended to be an employee welfare benefit plan, as defined in Section 3(1), Subtitle A of Title 1 of ERISA. The Plan will be interpreted to effectuate this intent.

Section 8.3 <u>Gender</u>. The masculine pronoun shall include the feminine pronoun and the feminine pronoun shall include the masculine pronoun and the singular pronoun shall include the plural pronoun and the plural pronoun shall include the singular pronoun, unless the context clearly indicates otherwise.

Section 8.4 <u>Limitation on Participant's Rights</u>. Nothing in this Plan shall be construed to guarantee terminated Eligible Employees any right to be recalled or rehired by a Member Company.

Section 8.5 <u>Severability</u>. If any provision of this Plan shall be held illegal or invalid, the illegality or invalidity shall not affect the remaining parts, which shall be enforced as if the illegal or invalid provision had not been included in this Plan.

16

EXHIBIT A

[INTENTIONALLY OMITTED]

17

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

EXHIBIT A

[INTENTIONALLY OMITTED]

17

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

EXHIBIT B

Golden Parachute Restriction.

(a)   Reduction for "Parachute Payment." Notwithstanding anything above in this Plan, if a Participant is a "disqualified individual" (as defined in Section 280G(c) of the Code), and the severance benefit provided for in Section 5.1, together with any other payments which the Participant has the right to receive from a Member Company would constitute a "parachute payment" (as defined in Section 280G(b)(2) of the Code), the severance benefit shall be reduced. The reduction shall be in an amount so that the present value of the total amount received by the Participant from a Member Company will be One Dollar ($1.00) less than three (3) times the Participant's base amount (as defined in Section 280G of the Code) and so that no portion of the amounts received by the Participant shall be subject to the excise tax imposed by Section 4999 of the Code.

(b)   Deferred Compensation and Reimbursements Exception. In no circumstances will a Member Company reduce the severance benefits payable to a Participant on account of the restrictions of this Exhibit by the amounts the Participant has the right to receive under an executive deferred compensation plan of the Member Company (Deferred Compensation Plan), amounts paid or payable to the Participant under such a Deferred Compensation Plan to reimburse him either fully or partially for excise tax and/or income tax on the reimbursement (gross up amounts), or amounts paid or payable to the Participant as indemnification for attorney's fees and legal expenses.

(c)   Determination of Reduction. The determination as to whether any reduction in the severance benefit is necessary shall be made by a Participant's Member Company in good faith, and the determination shall be conclusive and binding on the Participant.

(d)   Repayment of Excess Amount. If through error or otherwise the Participant should receive payments under this Plan, together with other payments the Participant has the right to receive from a Member Company, excluding Deferred Compensation Plan payments in excess of One Dollar ($1.00) less than three times his base amount, the Participant shall immediately repay the excess to the Member Company upon notification that an overpayment has been made.

18

Created by 10KWizard    www.10KWizard.com

Source: GREATER BAY BANCORP, 8-K, June 25, 2007

**GREATER BAY**

**BANCORP**

**CHANGE IN CONTROL PAY PLAN I**

**(Amended and Restated Effective September 28, 2007)**

EXHIBIT ___ C

**GREATER BAY BANCORP CHANGE IN CONTROL PAY PLAN I**
**Amended and Restated Effective September 28, 2007**

ARTICLE I

PURPOSE

GREATER BAY BANCORP (the "Company") established, effective as of January 1, 1998, the Change in Control Pay Plan I, as amended and restated effective as of August 21, 2001, and as of January 1, 2005, to provide severance benefits to eligible Employees whose employment terminates in connection with a Change in Control. The Company hereby further amends and restates such plan, effective as of September 28, 2007, in accordance with the terms set forth hereunder. The intent of the plan is to ensure all eligible Employees have reasonable protection related to any event as specified in this plan.

ARTICLE II

EFFECTIVE DATE

All of the policies and practices of each Member Company regarding severance, or similar payments upon employment termination on account of a Change in Control are hereby superseded by this plan which shall be known as the GREATER BAY BANCORP Change in Control Pay Plan I (the "Plan"), effective September 28, 2007.

ARTICLE III

DEFINITIONS

Section 3.1    Affiliated Company means:

(a)    Any corporation (other than the Company) that is included in a controlled group of corporations, within the meaning of Code Section 414(b), that includes the Company, and

(b)    Any trade or business (other than the Company) that is under common control with the Company within the meaning of Code Section 414(c), and

(c)    Any member (other than the Company) of an affiliated service group, within the meaning of Code Section 414(m), that includes the Company, and

(d)    Any other entity required to be aggregated with the Company pursuant to regulations under Code Section 414(o).

Section 3.2    Base Benefit means the severance benefit payable to a Participant in accordance with Articles IV and V of the Plan, the amount of which is based upon such Participant's Pay and his title or position in a Member Company as of the date he terminates employment with the Member Company on account of a Change in Control.

Section 3.3    <u>Board of Directors</u> means the board of directors of the Company.

Section 3.4    <u>Cause</u> means any of the following:

    (a)    The Employee's violation of any state or federal banking or securities law; or

    (b)    The Employee's violation of the Bylaws, rules, policies or resolutions of the Company; or

    (c)    The Employee's violation of the rules or regulations of the California Department of Financial Institutions, the Federal Deposit Insurance Corporation, the Federal Reserve Board of Governors, the Office of the Comptroller of the Currency or any other regulatory agency or governmental authority having jurisdiction over the Company or any Associated Company; or

    (d)    The Employee's conviction of any felony; or

    (e)    The Employee's commitment of an act involving moral turpitude, fraud, misappropriation, embezzlement or other dishonest conduct; or

    (f)    The Employee's failure to comply with any material terms or conditions of employment as established by the Company, or any applicable employment agreement or any written policies or directives of the Company; or

    (g)    The Employee's failure to properly perform his assigned work duties, which has not been appropriately corrected within 30 days or other established period following written notice from the Company of such failure.

Section 3.5    <u>Change in Control</u> means the first to occur of any of the following events:

    (a)    Any "person" (as that term is used in Section 13 and 14(d)(2) of the Securities Exchange Act of 1934 ("Exchange Act") becomes the beneficial owner (as that term is used in Section 13(d) of the Exchange Act), directly or indirectly, of more than fifty percent (50%) of the Company's capital stock entitled to vote in the election of directors, other than a group of two or more persons not (i) acting in concert for the purpose of acquiring, holding or disposing of such stock or (ii) otherwise required to file any form or report with any governmental agency or regulatory authority having jurisdiction over the Company which requires the reporting of any change in control.  The acquisition of additional stock by any person who immediately prior to such acquisition already is the beneficial owner of more than fifty percent (50%) of the capital stock of the Company entitled to vote in the election of directors is not a Change in Control;

3

(b)     During any period of not more than twelve (12) consecutive months during which the Company continues in existence, not including any period prior to the adopting of this Plan, individuals who, at the beginning of such period constitute the Board of Directors of the Company, and any new director (other than a director designated by a person who has entered into an agreement with the Company to effect a transaction described in clause (a), (c) or (d) of this Section 3.5) whose appointment to the Board of Directors or nomination for election to the Board of Directors was approved by a vote of at least a majority of the directors then still in office, either were directors at the beginning of the period or whose appointment or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof;

(c)     The effective date of any consolidation or merger of the Company (after all requisite shareholder, applicable regulatory and other approvals and consents have been obtained), other than (i) a consolidation or merger of the Company in which the holders of the common stock of the Company immediately prior to the consolidation or merger hold more than fifty percent (50%) of the common stock of the surviving corporation immediately after the consolidation or merger or (ii) a consolidation or merger of the Company with one or more other persons that are related to the Company immediately prior to the consolidation or merger.  For purposes of this provision, persons are "related" if one of them owns, directly or indirectly, at least fifty percent (50%) of the voting capital stock of the other or a third person owns, directly or indirectly, at least fifty percent (50%) of the voting capital stock of each of them;

(d)     The sale or transfer of substantially all of the Company's assets to one or more persons that are not related (as defined in clause (c) of this Section 3.5) to the Company immediately prior to the sale or transfer.

Section 3.6     Code means the Internal Revenue Code of 1986, as amended.

Section 3.7     Committee means the Benefits Administration Committee appointed by the Compensation Committee of the Company's Board of Directors or such other person or persons as the Board of Directors or the Compensation Committee of the Board of Directors may designate from time to time.

Section 3.8     Company means GREATER BAY BANCORP.

Section 3.9     Effective Date means September 28, 2007.

Section 3.10     Employee means (1) any full-time employee of a Member Company or (2) any regular part-time employee of a Member Company.  For purposes of this Section 3.10, "full-time employee" shall mean an employee of a Member Company who is regularly scheduled to work at least forty (40) hours per week for twelve (12) months each year.  Notwithstanding the foregoing, with respect to employees of a Member Company which requires fewer than forty (40) hours per week for classification as a full-time employee, "full-time employee" shall be

defined according to such Member Company's administrative policy and practice. "Regular part-time" employee shall mean any employee of a Member Company who is not a temporary or fixed term employee and is regularly scheduled to work at least twenty (20) hours per week for twelve (12) months each year, but fewer hours than necessary to classify him as a full-time employee.

Section 3.11    ERISA means the Employee Retirement Income Security Act of 1974, as amended.

Section 3.12    Member Company means the Company or an Affiliated Company, *provided* that the Compensation Committee of the Company's Board of Directors consents to the participation of any such Affiliated Company in the Plan with respect to eligible Employees of such Affiliated Company.

Section 3.13    Participant means an Employee who satisfies the requirements under Section 4.1 of the Plan.

Section 3.14    Pay means an Employee's current annual rate of regular base salary or wages on the date of termination of employment with a Member Company and the average of the annual cash incentive bonuses (other than any long-term cash incentives and warrant payment plans) received by (or would have been received if not deferred by) an Employee for the three-year period immediately preceding the calendar year in which the date of his termination of employment on account of a Change in Control occurs, excluding: (i) overtime or shift pay, (ii) commissions or draws from commission, (iii) incentive plans, programs or policies maintained by ABD Insurance and Financial Services and its Subsidiaries, (iv) signing bonuses or retention pay, (v) warrant income, (vi) premiums, supplements, imputed income, living, auto or other allowances or (vii) any other extra pay. The average of such annual cash incentive bonuses shall be the sum of such annual cash incentive bonuses received by the Employee for each calendar year in the three-year period with respect to which the Employee was eligible to receive an annual cash incentive bonus, divided by the number of calendar years (not exceeding three) that the Employee was eligible to receive such an annual cash incentive bonus. In calculating such average, any partial calendar year of employment commencing on or before September 30 of such year shall be treated as a full calendar year (i.e., both the year and any actual bonus amount for such year shall be included in the calculation of average bonus), and any partial calendar year of employment commencing after September 30 shall be ignored (i.e., both the year and any bonus amount for such year shall be excluded from the calculation of average bonus).

Section 3.15    Plan means the Greater Bay Bancorp Change in Control Pay Plan I.

Section 3.16    Plan Year means each twelve (12) consecutive month period from January 1 through December 31.

Section 3.17    Designated Employee means each of the employees who are specifically identified on Schedule A.

Section 3.18    Year of Service means a twelve (12)-continuous month period beginning on an Employee's most recent date of hire (or rehire), and each twelve (12)-continuous month period beginning on the anniversary of such hire (or rehire) date, during which the Employee remains continuously employed by a Member Company.

ARTICLE IV

ELIGIBILITY FOR BENEFITS

Section 4.1    Employees Eligible for Severance Benefits.  Except as provided in this Section 4.1 and in Sections 4.2 and 4.3 and subject to Section 5.6, an Employee whose employment is terminated by a Member Company or successor employer on or after the effective time of the Change in Control shall be eligible for a Base Benefit if:

(a)    Subject to Sections 4.2 and 4.3, the Employee's employment is terminated as a result of a Change in Control (or constructively terminated by not being provided a Comparable Position (as defined in Section 4.3)) within one (1) year following the effective time of the Change in Control (the "effective time" of the Change in Control will have the same meaning provided in Section 7.2); and

(b)    The Employee's employment is not terminated for Cause; and

(c)    The Employee executes a waiver and release agreement in such form as determined by the Committee (the "Waiver and Release Agreement") and returns the Waiver and Release Agreement to the Member Company within the time period (not to exceed 45 days or such longer period as may be required by applicable law) specified in the Waiver and Release Agreement.

For purposes of this Section 4.1, termination of employment includes termination of a Comparable Position that the Employee has accepted pursuant to an offer described in Section 4.2(b) below.

Section 4.2    Employees Not Eligible For Severance Benefits.  An Employee shall not be entitled to a Base Benefit set forth in Article V if:

(a)    The Employee has in force prior to the Effective Date an employment contract or severance agreement with a Member Company that includes provision for the payment of severance benefits upon the termination of employment with the Member Company upon a Change in Control, unless such severance benefits are less than the Base Benefit provided for in the Plan (in which case the Employee shall be entitled to the Base Benefit provided in the Plan in lieu of the severance benefits provided under such agreement); or

(b)    The Employee is provided a Comparable Position (as defined in Section 4.3 below) by the successor employer or by a Member Company, regardless of whether the Employee accepts the offer; or

(c)    The Employee's employment is involuntarily terminated for Cause; or

(d)    The Employee fails to perform his assigned job duties through the date specified by a Member Company as his termination date; or

6

(e)    The Employee accepts an offer of employment by a Member Company after the Company's public announcement of the event or events that subsequently constitute the Change in Control; or

(f)    The Employee fails to return a properly executed Waiver and Release Agreement on a timely basis.

Section 4.3    Comparable Position.  For purposes of Section 4.2, a "Comparable Position" shall mean a position that meets the following two requirements and such other requirements set forth below as are applicable to the Employee:

(a)    Provides a regular base salary or hourly wage rate that is not less than one hundred percent (100%) of the regular base salary or hourly wage rate of the position held by the Employee immediately prior to the effective time of the Change in Control;

(b)    Is based at a principal place of employment that would not require the Employee to increase his normal one-way commute from his home to the new primary work site by more than thirty-five (35) miles each way;

In addition, for an Employee who is a non-exempt staff member, a new position shall not be considered a Comparable Position if the position entails a material change (reduction or increase) in the number of scheduled work hours per pay period or in scheduled shift worked (but not in scheduled days of the week worked) from those worked by the Employee immediately prior to the effective time of the Change in Control.

An Employee's employment shall be considered terminated by a Member Company as a result of a Change in Control for purposes of Section 4.1 above, without a Comparable Position being provided for purposes of Section 4.2 above, if (i) the Employee's position is changed such that it would no longer be considered a Comparable Position under the criteria set forth above, or (ii) any successor in interest to the Member Company pursuant to the Change in Control fails to assume all obligations of the Member Company under this Plan, or (iii) the Member Company or its successor materially breaches any provision of this Plan pertaining to the Employee or materially breaches any material agreement between the Member Company or its successor and the Employee, in each case which condition continues after written notice from the Employee to the Member Company or its successor given within 90 days of the Change in Control and a reasonable opportunity by the Member Company or its successor to correct any such condition within 30 days following receipt of such notice.

ARTICLE V

SEVERANCE BENEFITS

Section 5.1    Calculation of Severance Benefit.  Subject to the provisions of Sections 4.1, 4.2, 4.3 and 5.6, a Participant whose employment is terminated (or constructively terminated by not being offered a Comparable Position as defined in Section 4.3) as a result of a Change in Control, shall be entitled to receive a Base Benefit under this Plan as follows:

7

(a)    <u>Designated Employees</u>.  A Participant who is a Designated Employee shall be entitled to receive a Base Benefit equal to the number of months of Pay set forth on <u>Schedule A</u>.

(b)    <u>Senior Vice Presidents and Executive Vice Presidents</u>.  A Participant who is a Senior Vice President, Executive Vice President or a Specialty Finance Business Unit President of a Member Company who is not a member of the Senior Management Council and is not a Designated Employee shall be entitled to receive a Base Benefit equal to twelve (12) months of Pay.

(c)    <u>Vice Presidents and Assistant Vice Presidents</u>.  A Participant who is a Vice President or Assistant Vice President of a Member Company shall be entitled to receive a Base Benefit equal to six (6) months of Pay.

(d)    <u>Exempt and Non-Exempt Staff</u>.  Employees of a Member Company who are either exempt or non-exempt staff shall be entitled to receive a Base Benefit equal to the greater of (i) three (3) months of Pay or (ii) two weeks of Pay for each full Year of Service.

A Participant shall not be entitled to a Base Benefit under more than one of the subsections (a) through (d) above.

Participants entitled to a Base Benefit shall also receive the following severance benefits:  (1) for a period equivalent to the number of months (weeks) of Pay on which the Base Benefit is determined, health care benefits (or COBRA coverage) under the Company's group health care plans then in effect on terms offered to current employees, to the extent such coverage is available and timely elected by the Participant under such Company plans, and, if under COBRA coverage, until such earlier time as the Participant has other group healthcare coverage or has declined COBRA coverage; (2) outplacement services deemed appropriate by the Committee; and (3) a pro-rated bonus for work performed during the year in which employment termination occurs under the bonus program applicable to the Participant for such year.  Proration of the bonus amount shall be based on the number of months the Participant was employed during the year of termination and the performance level of the Participant, subject to the Participant achieving at least a satisfactory performance evaluation for such year.

For purposes of calculating a Participant's severance benefits under Section 5.1(d), the Plan shall take into account only consecutive Years of Service beginning with the Participant's most recent date of hire or rehire and it shall not take into account partial Years of Service, nor shall a Participant receive severance benefits for years of Service for which he previously received severance benefits under the Plan.

Section 5.2    <u>Golden Parachute Restriction</u>.

(a)    <u>Reduction for "Parachute Payment</u>."  Notwithstanding anything above in this Article V, if a Participant is a "disqualified individual" (as defined in Section 280G(c) of the Code), and the severance benefit provided for in Section 5.1, together with any other payments which the Participant has the right to receive from a Member Company would constitute a

8

"parachute payment" (as defined in Section 280G(b)(2) of the Code), the severance benefit shall be reduced. The reduction shall be in an amount so that the present value of the total amount received by the Participant from a Member Company will be One Dollar ($1.00) less than three (3) times the Participant's base amount (as defined in Section 280G of the Code) and so that no portion of the amounts received by the Participant shall be subject to the excise tax imposed by Section 4999 of the Code.

(b)     <u>Deferred Compensation and Reimbursements Exception</u>. In no circumstances will a Member Company reduce the severance benefits payable to a Participant on account of the restrictions of this Section 5.2 by the amounts the Participant has the right to receive under an executive deferred compensation plan of the Member Company (Deferred Compensation Plan), amounts paid or payable to the Participant under such a Deferred Compensation Plan to reimburse him either fully or partially for excise tax and/or income tax on the reimbursement (gross up amounts), or amounts paid or payable to the Participant as indemnification for attorney's fees and legal expenses.

(c)     <u>Determination of Reduction</u>. The determination as to whether any reduction in the severance benefit is necessary shall be made by a Participant's Member Company in good faith, and the determination shall be conclusive and binding on the Participant.

(d)     <u>Repayment of Excess Amount</u>. If through error or otherwise the Participant should receive payments under this Plan, together with other payments the Participant has the right to receive from a Member Company, excluding Deferred Compensation Plan payments in excess of One Dollar ($1.00) less than three times his base amount, the Participant shall immediately repay the excess to the Member Company upon notification that an overpayment has been made.

Section 5.3     <u>Payment of Benefits</u>. The Company shall pay severance benefits to a Participant whose employment is terminated on account of a Change in Control in the form of a lump sum. The Company shall make such lump sum payment as soon as administratively practicable and in no event later than thirty (30) days following the receipt by the Company of a timely and properly executed Waiver and Release Agreement. Notwithstanding the foregoing, if any payment hereunder is considered "nonqualified deferred compensation" that is to be made to a Participant who is a "specified employee," in each case as defined and determined for purposes of Code Section 409A, within six months following a Participant's termination of employment, then such payment shall be delayed and paid on the first day of the seventh calendar month following the Participant's termination of employment to the extent that such payment is not otherwise exempt from the application of the 20% excise tax under Code Section 409A.

Section 5.4     <u>Payment Offset</u>. A Member Company reserves the right to offset the benefits payable under Section 5.1 by any advance, loan or other monies a Participant owes the Member Company. All applicable federal, state and local taxes shall be withheld from all severance payments.

9

Section 5.5     Unfunded Plan.  The obligations of a Member Company under this Plan may be funded through contributions to a trust or otherwise, but the obligations of the Member Company are not required to be funded under this Plan unless required by law.  Nothing contained in this Plan shall give a Participant any right, title or interest in any property of the Member Company.

Section 5.6     Prohibition Against Golden Parachute Payments.  Notwithstanding any provision of the Plan to the contrary, no Participant who is an institution affiliated party as the term is defined in Section 359.1(h) of the Federal Deposit Insurance Corporation Rules and Regulations ("FDIC Rules and Regs") shall be entitled to the payment of any severance benefit under the Plan to the extent that such payment shall be deemed a "golden parachute payment" as the term is defined in FDIC Rules and Regs. Section 359.1(f)(i)(ii) or (iii).

ARTICLE VI

ADMINISTRATION

Section 6.1     Plan Administration.  The Company shall be the administrator of the Plan for purposes of Section 3(16) of ERISA and shall have responsibility for complying with any ERISA reporting and disclosure rules applicable to the Plan for any Plan Year.

Section 6.2     Plan Committee.  In all respects other than as provided in Section 6.1, the Plan shall be administered and operated by the Committee.  The Committee shall have all powers necessary to supervise the administration of the Plan and control its operations.  In addition to any powers and authority conferred to the Committee elsewhere in the Plan or by law, the Committee shall have, by way of illustration but not by way of limitation, the following discretionary powers and authority:

    (a)    To allocate fiduciary responsibilities among the named fiduciaries and to designate one or more other persons to carry out fiduciary responsibilities.  However, no allocation or delegation under this Section 6.2(a) shall be effective until the person or persons to whom the responsibilities have been allocated or delegated agree to assume the responsibilities;

    (b)    To designate agents to carry out responsibilities relating to the Plan, other than fiduciary responsibilities;

    (c)    To employ such legal, accounting, clerical, and other assistance as it may deem appropriate in carrying out the provisions of this Plan, including one or more persons to render advice with regard to any responsibility any fiduciary may have under the Plan;

    (d)    To establish rules and procedures from time to time for the conduct of the Committee's business and the administration and effectuation of this Plan;

    (e)    To administer, interpret, construe and apply this Plan.  To decide all questions which may arise or which may be raised under this Plan by any Employee, Participant, former Participant or other person whatsoever, including but not limited to all questions relating to eligibility to

participate in the Plan, the amount of service of any Participant, and the amount of benefits to which any Participant may be entitled;

(f)    To determine the manner in which the severance benefits of this Plan, or any part thereof, shall be administered; and

(g)    To perform or cause to be performed such further acts as it may deem to be necessary, appropriate or convenient in the efficient administration of the Plan.

Any action taken in good faith by the Committee in the exercise of discretionary authority conferred upon it by this Plan shall be conclusive and binding upon the Participants. All discretionary powers conferred upon the Committee shall be absolute. However, all discretionary powers shall be exercised in a uniform and nondiscriminatory manner.

Section 6.3    Named Fiduciary.  The members of the Committee shall be named fiduciaries with respect to this Plan for purposes of Section 402 of ERISA.

Section 6.4    Indemnification of Committee.  The Company shall, to the extent permitted by law, by the purchase of insurance or otherwise, indemnify and hold harmless each member of the Committee and each other fiduciary with respect to this Plan for liabilities or expenses they and each of them incur in carrying out their respective duties under the Plan, other than for any liabilities or expenses arising out of such fiduciary's gross negligence or willful misconduct.  A fiduciary shall not be responsible for any breach of responsibility of any other fiduciary except to the extent provided in Section 405 of ERISA.

Section 6.5    Claims Procedure.

(a)    Applications for Benefits and Inquiries.  Any application for benefits, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Committee in writing by an applicant (or his authorized representative).  The address for the Committee is:

Plan Committee
c/o Human Resources
Greater Bay Bancorp
1900 University Avenue, Suite 600
East Palo Alto, CA 94303

(b)    Denial of Claims.  In the event that any application for benefits is denied in whole or in part, the Committee must provide the applicant with written or electronic notice of the denial of the application, and of the applicant's right to review the denial. Any electronic notice will comply with the regulations of the U.S. Department of Labor.  The notice of denial will be set forth in a manner designed to be understood by the applicant and will include the following:

(i)    the specific reason or reasons for the denial;

11

(ii) references to the specific Plan provisions upon which the denial is based;

(iii) a description of any additional information or material that the Committee needs to complete the review and an explanation of why such information or material is necessary; and

(iv) an explanation of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the applicant's right to bring a civil action under section 502(a) of ERISA following a denial on review of the claim, as described in Section 6.5(d) below.

This notice of denial will be given to the applicant within ninety (90) days after the Committee receives the application, unless special circumstances require an extension of time, in which case, the Committee has up to an additional ninety (90) days for processing the application. If an extension of time for processing is required, written notice of the extension will be furnished to the applicant before the end of the initial ninety (90) day period.

This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Committee is to render its decision on the application.

(c) <u>Request for a Review</u>. Any person (or that person's authorized representative) for whom an application for benefits is denied, in whole or in part, may appeal the denial by submitting a request for a review to the Committee within sixty (60) days after the application is denied. A request for a review shall be in writing and shall be addressed to:

Plan Committee
Greater Bay Bancorp
1900 University Avenue, Suite 600
East Palo Alto, CA 94303

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent. The applicant (or his representative) shall have the opportunity to submit (or the Committee may require the applicant to submit) written comments, documents, records, and other information relating to his claim. The applicant (or his representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his claim. The review shall take into account all comments, documents, records and other information submitted by the applicant (or his representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(d) <u>Decision on Review</u>. The Committee will act on each request for review within sixty (60) days after receipt of the request, unless special circumstances require an extension of time (not to exceed an additional sixty (60) days), for processing the request for a review. If an extension

12

for review is required, written notice of the extension will be furnished to the applicant within the initial sixty (60) day period. This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Committee is to render its decision on the review. The Committee will give prompt, written or electronic notice of its decision to the applicant. Any electronic notice will comply with the regulations of the U.S. Department of Labor. In the event that the Committee confirms the denial of the application for benefits in whole or in part, the notice will set forth, in a manner calculated to be understood by the applicant, the following:

    (i)    the specific reason or reasons for the denial;

    (ii)    references to the specific Plan provisions upon which the denial is based;

    (iii)    a statement that the applicant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his claim (excluding those protected by legal privilege); and

    (iv)    a statement of the applicant's right to bring a civil action under section 502(a) of ERISA.

(e)    <u>Rules and Procedures</u>. The Committee will establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out its responsibilities in reviewing benefit claims. The Committee may require an applicant who wishes to submit additional information in connection with an appeal from the denial of benefits to do so at the applicant's own expense.

(f)    <u>Exhaustion of Remedies</u>. No legal action for benefits under the Plan may be brought until the claimant (i) has submitted a written application for benefits in accordance with the procedures described by Section 6.5(a) above, (ii) has been notified by the Committee that the application is denied, (iii) has filed a written request for a review of the application in accordance with the appeal procedure described in Section 6.5(c) above, and (iv) has been notified that the Committee has denied the appeal. Notwithstanding the foregoing, if the Committee does not respond to a Participant's claim or appeal within the relevant time limits specified in this Section 6.5, the Participant may bring legal action for benefits under the Plan pursuant to Section 502(a) of ERISA.

## ARTICLE VII

## AMENDMENT AND TERMINATION

Section 7.1    Before Change in Control. This Plan may be amended from time to time, or terminated at any time at the discretion of the Board of Directors by a written resolution adopted by a majority of the Board of Directors, *provided, however*, that no amendment or termination shall adversely affect the right of a Participant to receive a severance benefit that the Participant has accrued on account of his termination of employment as a result of a Change in Control.

Section 7.2    After Change in Control. Notwithstanding the foregoing, the Plan may not be amended or participation discontinued after the effective time of a Change in Control. For purposes of this Plan, the "effective time" of a Change in Control shall have the same meaning provided in the agreement governing the transactions which give rise to the Change in Control.

## ARTICLE VIII

## GENERAL

Section 8.1    Payment Out of General Assets. The benefits and costs of this Plan shall be paid by the Company and each Member Company out of their general assets.

Section 8.2    Welfare Benefit Plan. This Plan is intended to be an employee welfare benefit plan, as defined in Section 3(1), Subtitle A of Title 1 of ERISA. The Plan will be interpreted to effectuate this intent.

Section 8.3    Gender. The masculine pronoun shall include the feminine pronoun and the feminine pronoun shall include the masculine pronoun and the singular pronoun shall include the plural pronoun and the plural pronoun shall include the singular pronoun, unless the context clearly indicates otherwise.

Section 8.4    Limitation on Participant's Rights. Nothing in this Plan shall be construed to guarantee terminated Employees any right to be recalled or rehired by a Member Company.

Section 8.5    Severability. If any provision of this Plan shall be held illegal or invalid, the illegality or invalidity shall not affect the remaining parts, which shall be enforced as if the illegal or invalid provision had not been included in this Plan.

14

## **Schedule A**

### **Base Benefit of 18 months**

<u>President, Employee Benefits</u>
Jim Hall

<u>President, Property & Casualty</u>
OPEN POSITION

<u>Division/Branch COO's</u>

    1.  Joseph Wyatt, Nevada
    2.  Trond Bodal, Pacific Northwest

<u>CFO</u>
Michael McCloskey

<u>Branch Presidents</u>

    1.  Nicholas Rossi, Nevada
    2.  Richard Lane, Pacific Northwest

<u>Executive Vice Presidents</u>

    1.  Ronald Weinhold, Oregon
    2.  Wayne Shira, Petaluma
    3.  James McCabe, Redwood City
    4.  Roger Reynolds, Sacramento
    5.  Graham Gardner, Seattle
    6.  Steve Stafford, Seattle

### **Base Benefit of 12-months**

<u>Senior Vice Presidents</u>

<u>Managing Directors</u>

<u>Branch Managers</u>

### **Base Benefit of 6-months**

<u>Vice Presidents</u>

<u>Assistant Vice Presidents</u>

### **Base Benefit of 3 months or 2 weeks/ year of service**

All others not included above



**Corporate Employee Relations**
MAC N8235-013
7000 Vista Drive
West Des Moines, IA 50266

April 24, 2008


Patrick Pierce
5182 Emiline Drive
San Jose, CA 95124

Re:  Claim for Benefits under the Greater Bay Bancorp Change in Control Pay Plan

Dear Mr. Pierce:

This letter is in response to your letter dated February 5, 2008, in which you claim benefits under the Greater Bay Bancorp Change in Control Pay Plan.  More specifically, you state that you are making a claim under the Greater Bay Bancorp Change in Control Pay Plan II as it existed prior to June 19, 2007 or alternatively under the Greater Bay Bancorp Change in Control Pay Plan II as it existed on that date (collectively referred to as the "Prior Plans").  The Prior Plans were superseded by the Greater Bay Bancorp Change in Control Pay Plan II Amended and Restated Effective September 28, 2007 ("CIC Plan II").  However, you have never been a participant in any of these plans because you were never an "Eligible Employee" under those plans.  The CIC Plan II defines "Eligible Employee" as a key executive.  This is further defined as "members of the Company's Managing Committee or members of the Company's Senior Management Council and who are listed on Exhibit A hereto."  CIC Plan II, Section 3.11.  You are not listed on Exhibit A, nor were you a member of the Managing Committee or the Senior Management Council.

For the reasons described above, your claim for benefits under the Prior Plans and the CIC Plan II is denied.

For your convenience, I have enclosed a copy of the CIC Plan II document.

My review revealed that you were potentially eligible to participate in a plan known as the Greater Bay Bancorp Change in Control Pay Plan I, which was established in 1998, amended and restated in 2001, again amended and restated effective January 1, 2005 ("2005 Plan"), and finally amended and restated by the Greater Bay Bancorp Change in Control Pay Plan I Amended and Restated Effective September 28, 2007 ("CIC Plan I").  The CIC Plan I superseded the 2005 Plan.  Please see Article II which states,

> *All of the policies and practices of each Member Company regarding severance or similar payments upon termination on account of a Change in Control are hereby superseded by this plan which shall be known as the GREATER BAY BANCORP Change in Control Pay Plan I (the "Plan"), effective September 28, 2007.*



I have attached a copy of the CIC Plan I document for your reference. Because you could potentially be eligible for benefits under CIC Plan I, I also reviewed your claim under the provisions of CIC Plan I. The remainder of this letter focuses on my review of the information contained in your letter in relation to the provisions of CIC Plan I and the outcome of discussions I've had with appropriate parties. For purposes of this response, please note that unless otherwise stated in this letter, capitalized terms are defined in the CIC Plan I document.

**Claim**

In your letter you state that your are entitled to benefits because your position with Wells Fargo as a Loan Adjustment Manager 3 was temporary and that it was not "a position of comparable pay and status to your former position" as a Senior Vice President and Director of Specialty Assets at Greater Bay Bancorp.[1]

**Relevant Plan Provisions**

Section 4.1 of CIC Plan I describes those Employees who are eligible for benefits if their employment is terminated by a Member Company or a successor on or after the effective time of the Change in Control. Section 4.1(a) states:

> *(a)      Subject to Sections 4.2 and 4.3, the Employee's employment is terminated as a result of a Change in Control (or constructively terminated by not being provided a Comparable Position (as defined in Section 4.3 within the one (1) year following the effective time of the Change in Control (the "effective time" of the Change in Control will have the same meaning provided in Section 7.2; and...*

---

[1] In your letter, you state that you are entitled to benefits under a prior version of the CIC Plan II, rather than the currently effective version. Since your letter is not directed at the CIC Plan I, you do not make a similar argument that you are entitled to benefits under a prior version of the CIC Plan I. Nevertheless, since you have generally raised the issue of which version of the plan applies, I find that the current version of the CIC Plan I is the operative version. Article VII of the 2005 Plan regarding amendment and termination of the plan states:

> Section 7.1. <u>Before Change in Control</u>. This Plan may be amended from time to time, or terminated at any time at the discretion of the Board of Directors, provided, however, that no amendment or termination shall adversely affect the right of a Participant to receive a Severance Benefit that the Participant has accrued on account of his termination of employment as a result of a Change in Control.

The 2005 Plan was amended and restated effective September 28, 2007. At the time the plan was amended and restated, you were not a "Participant" as defined in the 2005 Plan. Furthermore, you also are not a "Participant" as defined in the CIC Plan I, but since you are an "Employee" as defined in CIC Plan I and CIC Plan I was the operative plan on October 1, 2007 (the "effective time" of the Change in Control), this is the plan under which I evaluated your claim. I have attached a copy of the 2005 Plan for your convenience.

Section 4.2 of CIC Plan I describes those Employees who are not eligible for benefits. Section 4.2 states in part:

> *An Employee shall not be entitled to a Base Benefit set forth in Article V if:...(b) The Employee is provided a Comparable Position (as defined in Section 4.3 below) by the successor employer or by a Member Company, regardless of whether the Employee accepts the offer...*

Section 4.3 defines a "Comparable Position." Section 4.3 states in part:

> *...a "Comparable Position" shall mean a position that meets the following two requirements...(a) Provides a regular base salary or hourly wage that is not less than one hundred percent (100%) of the regular base salary or hourly wage rate of the position held by the Employee immediately prior to the effective time of the Change in Control; (b) Is based at a principal place of employment that would not require the Employee to increase his normal one-way commute from his home to the new primary work site by more than thirty-five (35) miles each way...*

## Facts

You state that the Loan Adjustment Manager 3 position offered to you following the Change in Control was a "temporary" position which would be completed by February 28, 2008, and that it was not a "position of comparable pay and status." I do not understand you to be claiming that your employment was actually terminated, but rather that your employment was "constructively terminated" in that you were not offered a Comparable Position. *See* CIC Plan I, Sections 4.1, 4.3. You do not contend that your commute was increased after the Change in Control by more than 35 miles each way.

I spoke to Brigitte Stream, Human Resources Consultant for your Wells Fargo business unit and your Wells Fargo supervisor, Jeanette Mebane, Vice President, CMG California Manager to understand your transition to the Loan Adjustment Manager 3 position following the Change in Control. I also reviewed two letters dated November 1 and November 8, 2007 which confirmed the terms of your position at Wells Fargo.

My review revealed that on November 1, 2007, you were offered a full-time position with Wells Fargo Bank, N.A. as a Loan Adjustment Manager 3 reporting to Ms. Mebane. The annual base salary for the position was – and is -- ███████ (less applicable taxes and withholdings) payable bi-weekly on Wells Fargo's regularly scheduled paydays beginning January 1, 2008. An additional █████ was added to your salary to compensate for an auto allowance benefit that was provided in your prior role, which resulted in an annualized salary of ██████. Your salary immediately prior to the Change in Control was ██████. Accordingly, your salary after the Change in Control was "not less than one hundred percent (100%) of the regular base salary or hourly wage rate of the position held by the Employee immediately prior to the effective time of the Change in Control." *See* CIC Plan I, Section 4.3. Because you were neither actually terminated as a result of a Change in Control nor constructively terminated (*i.e.,*

you were offered a Comparable Position), you are not entitled to benefits under the CIC Plan I. *See* CIC Plan I, Sections 4.1, 4.2(b), 4.3.

Regarding your statement that the position offered to you was "temporary," I investigated and found the following. Prior to the November 1, 2007 letter, Ms. Mebane states that she, Robert Creed and Sidney Copeland met with you to discuss the transition. Ms. Mebane explained to you that you would be working the same book of business and have the same number of direct reports as those in your Greater Bay Bank position. At that time you stated that you had no desire to work at Wells Fargo and that you would assist with the transition of Greater Bay Bancorp but would be leaving by February 28, 2008. Ms. Mebane, Mr. Creed and Mr. Copeland accepted your decision to decline their offer of a full-time Loan Adjustment Manager 3 position after February 28th, and offered to put you on a non-working status for an additional 31 days to assist you in finding other opportunities within Wells Fargo through March 31, 2008. The November 1, 2007 letter was a confirmation of the terms previously discussed between you and Ms. Mebane, Mr. Creed and Mr. Copeland.

Both Ms. Mebane and Ms. Stream provided me with the second letter that was sent to you dated November 8, 2007. This letter came from Kathy Kroll, Human Resources Manager. The purpose of Ms Kroll's letter was to clarify that your position at Wells Fargo was not "temporary" and that if you chose to voluntarily terminate your employment, you could do so but you would not be eligible for severance benefits.

**Determination**
Based on my review of your claim and the provisions of CIC Plan I, I must conclude that you are not eligible for severance benefits under Section 4.1 of CIC Plan I. The Loan Adjustment Manager 3 position described in the November 1st letter meets the criteria of a "Comparable Position" as defined in Section 4.3 of CIC Plan I. The Loan Adjustment Manager 3 position provided you a higher base salary as compared to your prior position at Greater Bay Bank and your principal place of employment did not change. Moreover, your decision to decline the offer of a Comparable Position, and to accept it only on a temporary basis, does not make you eligible for benefits. *See* CIC Plan I, Section 4.2(b).[2]

**Right to Request Review of this Decision**
You have a right to request a review of this decision to by submitting a request for review to the Plan Administrator within 60 days of your receipt of this letter at the following address:

---

[2]  As illustrated in this paragraph, your employment at Wells Fargo was not constructively terminated because you were provided a Comparable Position. Further, Wells Fargo did not actually terminate your employment. Rather, I recently learned that you voluntarily terminated your employment at Wells Fargo effective April 4, 2008 further supporting the determination that you are not eligible for severance benefits under Section 4.1 of CIC Plan I.

Plan Administrator
Wells Fargo & Company Salary Continuation Pay Plan
Plan Administrator
C/O Wells Fargo's Corporate Employee Relations Department
MAC N9303-130
608 Second Avenue South, 13th Floor
Minneapolis, MN  55402-1916

Wells Fargo's Executive Vice President and Director of Human Resources is responsible for reviewing requests for review.  As stated in the CIC Plan I, Section 6.5(c),

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent. The applicant (or his representative) shall have the opportunity to submit (or the [Executive Vice President and Director of Human Resources] may require the applicant to submit) written comments, documents, records, and other information relating to his claim. The applicant (or his representative) shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to his claim. The review shall take into account all comments, documents, records and other information submitted by the applicant (or his representative) relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

You will receive a decision on your request for review within 60 days following the Plan Administrator's receipt of your request for review unless special circumstances require an extension of time.  If an extension of time is required, you will be notified in writing during the initial 60 day period.  *See* CIC Plan I, Section 6.5(d).

If your request for review is denied, you will have the right to bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1976, as amended from time to time (ERISA).  *See* CIC Plan I, Section 6.5(f).


Sincerely,

*Shelly L. Johnson*

Shelly L. Johnson
Employee Relations Consultant
Corporate Employee Relations
On behalf of the Plan Administrator


cc:    Plan Administrator